MADELINE HALEY & another[1] *vs.* ALLIED CHEMICAL CORPORATION
(and a companion case[2]).

Middlesex.   October 4, 1967. — December 1, 1967.

Present: WILKINS, C.J., SPALDING, CUTTER, KIRK, & SPIEGEL, JJ.

*Negligence*, Of seller, Dangerous article, Acid, Duty to warn.   *Sale*, Warranty.

In an action against a seller of strong acids for personal injuries suffered by an etcher employed by the buyer when one of the defendant's unvented containers exploded in the buyer's etching room probably because of the pressure of gas created by a mixture of an acid and hydrogen peroxide in the container, a finding of negligence on the part of the defendant was not warranted where there was evidence that the defendant's containers were plastic bottles specially manufactured and capped for safety in shipment of the acids and storage of them prior to use and that the identity of the person who mixed the contents of the bottle which exploded was never ascertained and, although there was evidence that the defendant knew that hydrogen peroxide was kept in the buyer's etching room and that there was a possibility that the hydrogen peroxide might come in contact with an acid, there was also uncontradicted evidence that at safety meetings between the defendant's and the buyer's personnel prior to the explosion specific warnings against such contact were given. [329–331]

Warranties by a seller of acids and a manufacturer of containers for the acids were not extended by G. L. c. 106, § 2–318 to an etcher employed by the buyer of the acids, and the etcher was barred from recovery on such warranties by absence of privity of contract with the seller or the manufacturer. [331]

TORT.   Writ in the Superior Court dated January 10, 1963.

TORT OR CONTRACT.   Writ in the Superior Court dated August 29, 1963.

The actions were tried before *Taveira*, J.

*Albert P. Zabin* for the plaintiffs.

*Peter D. Cole* for Allied Chemical Corporation.

*Steven J. Cohen* (*Bertram A. Sugarman* with him) for Plax Incorporated.

[1] William Haley, husband of Madeline, who seeks consequential damages.

[2] The companion case is by the same plaintiffs against Monsanto Chemical Co. and Plax, Incorporated (Plax).   Verdicts were directed for Monsanto on all counts.   The plaintiffs do not argue that this was error.   Accordingly we do not consider the exceptions with respect to Monsanto.

KIRK, J. The plaintiffs brought these actions for personal injuries, alleging negligence and breach of warranty, against Allied Chemical Corporation (Allied) a vendor of acids. and against Plax, the manufacturer of the containers of the acids. The plaintiff Madeline was employed as an etcher by North American Electronics Corp. (Electronics) the buyer of the acids. Verdicts were directed for both Allied and Plax on the warranty counts. The negligence counts were submitted to the jury, who returned verdicts for Plax and for the plaintiffs against Allied. The judge, subject to exception, entered verdicts for Allied under leave reserved. The exceptions argued are to the action of the judge in directing verdicts for Allied and Plax on the warranty counts and in entering verdicts for Allied on the negligence counts.

We review and summarize the evidence under the rule stated in *Kelly* v. *Railway Exp. Agency, Inc.* 315 Mass. 301, 302. *Tanguay* v. *Wood Conversion Co.* 347 Mass. 530, 531. Almost all of the evidence came from witnesses called by the plaintiffs, including employees of Allied. Since Electronics' organization in 1959 to the date of the accident on September 13, 1961, it had bought its liquid chemicals from Allied. Among the chemicals were hydrofluoric and nitric acids. Both are extremely corrosive. Hydrofluoric acid, for example, "will attack practically everything, glass, steel, all types of metal." If a sufficient quantity should leak out of a bottle in transit, "it would burn a hole right through the freight car." Each of the two acids when shipped by Allied was contained in one gallon bottles or jugs made of polyethelene, commonly called plastic. The jugs were made by Plax pursuant to specifications given by Allied. The buyer of the acids paid a deposit on the jugs, which were returnable to Allied, whose name was impressed in the polyethelene. Polyethelene is a strong, flexible, acid-resistant synthetic material. It retains these characteristics for at least ten years and permits the manufacture of a seamless container. The jugs in which the hydrofluoric and nitric acids were sold to Electronics were closed by a

solid nonvented polyethelene screw-on cap within which
there was a thin solid polyethelene disc. This type of cap
prevents leakage or spillage of the corrosive acids if the jug
is turned over. It is a good and safe cap for uncontami-
nated hydrofluoric acid or nitric acid. It will hold them
in the bottle. The jug which exploded had a nonvented
cap.

Allied also shipped some chemicals in jugs with vented
caps. It sold hydrogen peroxide to Electronics in either
glass or polyethelene bottles with a vented cap. The reason
is that hydrogen peroxide decomposes or breaks down rapidly
if contaminants are added, creating great quantities of gas
which must be released if an explosion is to be avoided.
A vented cap was used to release from the jug the gas result-
ing from the contamination of hydrogen peroxide. Neither
hydrofluoric acid nor nitric acid alone generates gas under
normal conditions, nor do they when mixed together. If
either alone, or a mixture of the two, however, is added to
hydrogen peroxide, there is quickly liberated a gas which
if confined in a jug would cause the jug to explode. A
vented cap differs from an unvented cap in that it has a hole
in the top and a slitted plastic washer inside. The slit is
closed until the pressure from gas is built up. When the
pressure is sufficiently built up, the slit in the washer opens
and releases it. When the vent is closed, there is probably
no chance of the liquid spilling.

Madeline's job involved in part the use of a prescribed
mixture of hydrofluoric and nitric acids to etch parts used
in the manufacture of a device produced by Electronics.
The parts were then washed in running water and dipped
in hydrogen peroxide. The hydrofluoric and nitric acids
were mixed in a plastic bottle which was then placed under
the sink in the etching room. When new, hydrofluoric acid
and nitric acid are visually indistinguishable from distilled
water; all are clear. It was customary in the electronics
industry to use plastic bottles for mixing acids. On the
day of the accident, September 13, 1961, Madeline mixed
hydrogen peroxide and distilled water, put the cap on the

bottle, placed the bottle under the sink, and started to leave the room when the explosion took place. She did not mix any hydrogen peroxide with hydrofluoric acid. Although she did not know what would happen if she did mix them, she knew that she was not supposed to mix them. She had been told to "be careful." She was not sure that the bottle which blew up was the bottle in which she had put the hydrogen peroxide. The identity of the person who mixed the contents of the jug which exploded was never ascertained.

The explosion did not cause the jug to disintegrate or fragment. The cap, which was the strongest part of the unit, remained intact. There were vertical splits or ruptures around the jug caused by the pressure of the gas within it which resulted in the liquid being forcefully expelled.

There was no serious dispute that the probable cause of the explosion was the mixture and containment of hydrogen peroxide and an acid in an unvented plastic bottle. The atmospheric conditions which otherwise might conceivably have accounted for the explosion were not shown to have existed. The experts were agreed that if the plastic bottle containing the mixture had had a vented cap there would have been no explosion.

Allied's representative knew that its jugs were being used to mix and store acids at Electronics, that the employees in the etching room were not skilled chemists, that hydrogen peroxide was kept in the etching room, and that there was a possibility that the acids in the same room might be in contact with it. He testified that two safety meetings were held at which these matters were pointed out to Electronics' personnel; that the second was held four weeks before the accident.

The purchasing director and plant superintendent of Electronics conceded that there had been a safety meeting of Allied and Electronics people but stated that he did not attend. He knew that there were four or five chemicals on the premises some of which, when mixed, generated gas; that some of the bottles had venting caps, and that any

bottle containing a chemical which will generate gas should
have a vent cap to release the gas. He knew that hydrogen
peroxide was treated differently because it had to be vented.
He had never received instructions from Allied not to reuse
the bottles for mixing acids. Madeline's immediate super-
visor at Electronics had never received instructions from
Allied not to reuse Allied's jugs for mixing acids or storing
mixed acids. He knew that jugs of hydrofluoric acid, nitric
acid and hydrogen peroxide were among the chemicals kept
in the etching room and that plastic jugs of acid were kept
under the sink. He knew that there was a difference in the
caps used on jugs to mix things and that some caps were
vented. He knew that some acids when confined generate
gas and that if the gas is not released through a venting
hole "something can happen."

The jugs received by Electronics from Allied bore labels
identifying the chemical contents. The labels on the acid
bottles cautioned to "loosen bottle closures carefully" or
"Open carefully to relieve possible internal pressure before
completely removing closure." They specified the hazards
of poison or burns and prescribed antidotes and precautions
against spillage. On the day of the accident the labels on
the bottles in the etching room and another room were
"practically illegible."

On the evidence, the judge was right in entering verdicts
for Allied on the negligence counts under leave reserved.
"[A] person who owns or controls an instrumentality which
he knows, or with reasonable care should know, is dangerous
in its nature or is in a dangerous condition and who disposes
of it in a manner that he foresees, or in the exercise of reason-
able care ought to foresee, will probably carry that thing
into contact with some person, known or unknown, who will
be ignorant of the danger, owes a legal duty to every such
person to use reasonable care to prevent injury to him."
*Mann* v. *Cook*, 346 Mass. 174, 176–177. *Carter* v. *Yardley &
Co. Ltd.* 319 Mass. 92, 96. If Allied had not been aware of
the loose safety practices at Electronics, this obligation
would have been fully met. Allied had shipped each of the

chemicals in a specially manufactured container closed by a cap specially and adequately designed to guard against the hazards which might reasonably be anticipated from the particular chemical during shipment and storage prior to use. We think Allied could reasonably have relied on Electronics thereafter to take proper safety precautions and to instruct its own employees in the proper technique to be used in handling these dangerous acids. "It was the . . . [Electronics'] common law duty to furnish . . . [its employees] safe materials with which to work or to warn . . . [them] of any dangers of which . . . [it] knew or ought to have known and which were not reasonably obvious to . . . [them]." *Taylor* v. *Newcomb Baking Co.* 317 Mass. 609, 611. See *Peacock* v. *Ambassade Realty Co.* 336 Mass. 115, 118.

There remains, however, the question whether any additional duty was placed on Allied by its knowledge that the bottles were being used by Electronics to mix acids and to store mixed acids in the etching room. The duty to exercise reasonable care includes a duty to warn of danger, if "the person on whom that duty rests has some reason to suppose a warning is needed." *Carney* v. *Bereault,* 348 Mass. 502, 506. It does not appear from the evidence that Allied failed to perform this duty. The evidence indisputably shows that at Allied's suggestion, a safety meeting was held between Allied's and Electronics' supervisory personnel prior to the accident. There was testimony that at the meeting it was pointed out that (a) the bottles designed for hydrofluoric acid should be returned after use, but (b) if they were to be used to contain any other acid, it should be done under a certain condition, and (c) hydrogen peroxide very specifically should not come in contact with any strong acids. This testimony was left entirely uncontradicted as to points (b) and (c) and was not directly contradicted as to point (a). The affirmative of the issue was on the plaintiffs, see *Cadogan* v. *Boston Consol. Gas. Co.* 290 Mass. 496, 499. There was no evidence of failure to warn of the danger of which Allied had become aware. It was not Allied's responsibility to

compel the attendance of Electronics' personnel at the meeting or to enforce safety regulations in Electronics' plant, or to train Electronics' employees in the etching room.

The breach of warranty counts may be dealt with summarily. It was correct to direct verdicts for both Allied and Plax because there was no privity of contract between Madeline and either of them. *Kennedy* v. *Brockelman Bros. Inc.* 334 Mass. 225, 227. *Sullivan* v. *H. P. Hood & Sons, Inc.* 341 Mass. 216, 223. The Uniform Commercial Code, G. L. c. 106, § 2–318, dispenses with this requirement only in the case of a "natural person who is in the family or household of . . . [the] buyer or . . . a guest." None of these relationships exists here.

The plaintiffs' exceptions with respect to Monsanto are dismissed. All their other exceptions are overruled. Judgments are to be entered for the defendants.

*So ordered.*