ANNA F. NECKTAS, administratrix, & individually, *vs.*
GENERAL MOTORS CORPORATION, PONTIAC DIVISION, &
another.

Suffolk.    January 9, 1970. — May 29, 1970.

Present: WILKINS, C.J., SPALDING, CUTTER, KIRK, SPIEGEL, REARDON,
& QUIRICO, JJ.

*Negligence,* Manufacturer, Dealer.    *Sale,* Warranty.    *Motor Vehicle,* Defect.    *Death.    Executor and Administrator,* Action for death.

In an action against the manufacturer of an automobile and the dealer
    from whom it was purchased new by the plaintiff, to recover as administratrix of her son's estate for his death occurring fifteen days
    after the purchase as he was driving the automobile in a straight portion of the south bound lane of a divided highway when the automobile
    crossed the median strip diagonally about thirty feet and went into
    the north bound lane where it was struck on the right side by another
    automobile, evidence did not warrant a finding of negligence on the
    part of either defendant, even though the plaintiff's automobile

had a defective power steering unit when she purchased it. [549]
SPIEGEL, J., dissenting, with whom KIRK, J., joined.

Absence of privity of contract between a purchaser of an automobile
from a dealer and the manufacturer of the automobile barred the pur-
chaser's recovery from the manufacturer for alleged breach of war-
ranty with respect to its power steering unit. [549]   SPIEGEL, J.,
dissenting, with whom KIRK, J., joined.

Evidence in an action warranted findings that a new automobile had a
defective power steering unit when purchased from a dealer and that
this defect constituted a breach of warranty entitling the purchaser
to recover from the dealer for damage to the automobile resulting from
a failure of the power steering unit which caused a collision between
the automobile and another automobile. [549]

An alleged breach of warranty by reason of a defective power steering
unit of a new automobile purchased from a dealer, which caused a
collision involving the automobile and resulting in the death of the
purchaser's son, gave the purchaser no basis as administratrix of his
estate for recovery for his death from the dealer under G. L. c. 229
§ 2. [549–550]

CONTRACT AND TORT. Writ in the Superior Court dated
August 30, 1963.

The action was tried before *Goldberg,* J.

*John F. Finnerty* for Columbia Pontiac Co., Inc.

*Ralph C. Copeland* for General Motors Corporation,
Pontiac Division.

*Robert W. Duquet* (*Stephen A. Bache* with him) for the
plaintiff.

REARDON, J. Anna F. Necktas recovered verdicts in
this action of contract and tort against General Motors
Corporation, Pontiac Division (GM), and Columbia Pontiac
Co. Inc. (the dealer) on five counts, one in tort (negligence)
by Mrs. Necktas as administratrix against each defendant
for the death of her son, Edward F. Necktas, Jr. (counts
5 and 6), one by Mrs. Necktas individually against each
defendant for property damage to her automobile for
breach of warranty (counts 9 and 10), and one for breach of
warranty against the dealer for Necktas's death (count 11).
The bill of exceptions presents the issue whether a directed
verdict was properly denied on each count.

On October 15, 1962, the plaintiff purchased a new 1963
Pontiac sports coupe from the dealer. The car was driven

to her home by her husband. She never did have the opportunity to drive the vehicle "but rode in it a few times and noticed nothing unusual about its operation." From the time of the purchase until the date of the accident, October 30, 1962, no repairs were made on the car. On the latter date the plaintiff's son, who did not smoke cigarettes or drink alcoholic beverages, took the car about 8:15 P.M., and while driving along Route No. 1 in Dedham was killed as the result of a collision between the motor vehicle he was driving and another.

At the time of the accident the plaintiff's car had been traveling in the south bound lane of Route No. 1 at a point where the road was straight. It crossed the median strip diagonally about thirty feet and went into the north bound lane where another vehicle struck it on the right side. There were no tire or skid marks on the south bound roadway prior to the point where the plaintiff's car left it. There were tire marks approximately forty-five feet from the point where the plaintiff's vehicle left the median strip to the point of the accident.

A research mechanic working at the Harvard Medical School Department of Legal Medicine testified for the plaintiff that he inspected the plaintiff's vehicle at approximately 9:30 P.M. on October 30, 1962. The odometer indicated that the car had been driven approximately 500 miles. Upon further examination he discovered that he could not move the pulley of the power steering unit with a stillson wrench. "This pulley has a V-type rubber belt that runs from the crank-shaft to the power steering unit and the V-type belt drives this pulley around . . . . [T]his pulley should turn freely." The V-type rubber belt was burned on both sides and "the only way the belt could be burned on both sides is the fact that the pulley was frozen and the belt was being driven over the frozen pulley creating friction." Further, the oil reservoir of the power steering unit was empty and an odor of sulphur emanated from it. The mechanic testified that if the oil or fluid level in the reservoir were low, or if there were no oil, a clattering noise would be

heard by anyone in the vehicle. He further stated that in the event of a failure of the power steering mechanism "the manual or ordinary steering mechanism of the car would not be interfered with." This is the only evidence in the record concerning the material effect of the failure of the power steering mechanism. Compare *Swillie* v. *General Motors Corp.* 133 So. 2d 813 (Ct. App. La.), cited to us by the plaintiff during argument, where the evidence seems clear that injury was caused in an accident which occurred when there was a brake failure on a truck due to a defective flare in the brake tubing installed by the defendant.

The opinion of a majority of the court on the five counts which were submitted to the jury is as follows:

(a) Mrs. Necktas has not produced sufficient evidence to warrant a finding that either GM or the dealer was negligent. Therefore it was error for the court to deny the motions of the defendants for directed verdicts in their favor on the death counts 5 and 6, respectively, based on alleged negligence.

(b) There being shown no privity of contract between Mrs. Necktas and GM, it was error for the court to deny the motion of GM for a directed verdict in its favor on count 9 based on alleged breach of warranty. *Spring Valley Country Club, Inc.* v. *Malden Supply Co.* 349 Mass. 764. *Haley* v. *Allied Chemical Corp.* 353 Mass. 325, 331.

(c) The jury could infer from the evidence that the plaintiff's car had a defective power steering unit when she purchased it from the dealer and that this constituted a breach of warranty. There was no error in denying the defendant's motion for a directed verdict on count 10 against the dealer.

(d) There can be no recovery from the dealer for the death of Edward Necktas on the basis of any alleged breach of warranty. The right of recovery for death is purely statutory and is based either upon negligence or upon a wilful, wanton or reckless act causing death. G. L. c. 229, § 2. In this Commonwealth "[t]he whole subject is now covered by statutes." *Sherlag* v. *Kelley*, 200 Mass. 232, 234.

The death statute provides no right of recovery for a death resulting from a contractual breach of warranty alone. Therefore, it was error for the court to deny the motion of the dealer for a directed verdict in its favor on count 11.

*Exceptions sustained on counts 5, 6, 9 and 11.*

*Exceptions overruled on count 10.*

SPIEGEL, J. (with whom Kirk, J. joins) dissenting. I am unable to agree with the majority that there cannot be recovery against the manufacturer on count 9 for breach of warranty. Likewise, I do not agree that the plaintiff is barred from recovery on counts 5 and 6 for "wrongful death" against the manufacturer and the dealer.

I agree with the majority that the "jury could infer from the evidence that the plaintiff's car had a defective power steering unit when she purchased it from the dealer and that this constituted a breach of warranty."

This conclusion necessarily requires the determination that the defect was the proximate cause of the accident. *Benavides* v. *Stop & Shop, Inc.* 346 Mass. 154, 156–157, and cases cited. In regard to the issue of causation, Restatement 2d: Torts, § 433B (1) states: "the burden of proof that the tortious conduct of the defendant has caused the harm to the plaintiff is upon the plaintiff." The comments on subsection (1) succinctly state the burden of proof that a plaintiff must satisfy before the case can go to the jury. The comments read as follows: "a. . . . As on other issues in civil cases, the plaintiff is required to produce evidence that the conduct of the defendant has been a substantial factor in bringing about the harm he has suffered, and to sustain his burden of proof by a preponderance of the evidence. This means that he must make it appear that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the harm. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation and conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant."

"b. The plaintiff is not, however, required to prove his case beyond a reasonable doubt. He is not required to eliminate entirely all possibility that the defendant's conduct was not a cause. *It is enough that he introduces evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it was not.* The fact of causation is incapable of mathematical proof, since no man can say with absolute certainty what would have occurred if the defendant had acted otherwise. If, as a matter of ordinary experience, a particular act or omission might be expected to produce a particular result, and if that result has in fact followed, the conclusion may be justified that the causal relation exists. *In drawing that conclusion, the triers of fact are permitted to draw upon ordinary human experience as to the probabilities of the case . . ."* (emphasis supplied).

There was evidence that the car was purchased new and was driven approximately 500 miles, that no repairs were made to the car and that nothing was unusual about its operation. From this the jury could infer that the driver of the car had no reason to suspect there was anything wrong with the power steering mechanism.

There was evidence that the decedent, the son of the plaintiff, did not smoke or drink, that he took the car about 8:15 P.M., and that the accident occurred shortly thereafter. From this the jury could conclude that the driver was an abstemious young man in possession of all of his faculties.

It is common knowledge that millions of people drive cars equipped with "power steering" and that with power steering all that is required is a slight movement of the hand on the steering wheel to move the vehicle in the desired direction. Manual steering requires a firm grasp of the wheel and a substantial amount of strength must be used in steering the vehicle.

The jury would be warranted in inferring that when the power steering mechanism failed several seconds might have elapsed before the driver exercised the amount of strength

necessary to compensate for the change to manual steering, and during that interval the vehicle could have traveled a considerable distance. Regardless of the direction the driver intended the vehicle to travel, the jury could infer that he did not intend the car to proceed across the center strip of the divided highway [1] toward automobiles proceeding in the opposite direction.

The research mechanic gave certain testimony, not alluded to in the opinion, which I believe to be particularly significant. In addition to testifying that the oil reservoir of the power steering unit was empty, he stated that the oil in this reservoir supplies the power steering pump unit which in turn "creates the pressure which moves the pistons and tie rods and makes the wheels go back and forth." He further testified that "the power steering unit is located on the driver's side of the vehicle in back of the radiator and that this section of the car was undamaged by the impact." Even though there was no direct testimony explaining the reason for the absence of lubricating oil in the reservoir, I believe, as apparently the majority did, that the jury could infer from all of the evidence that the power steering unit was the proximate cause of the accident.

The inferential process used to find causation seems to me equally applicable to establish that the defect in the power steering mechanism was the result of the negligence of the defendants. I find it extremely difficult to maintain that a jury can infer causation from the fact that there was no fluid in the power steering unit reservoir and yet hold that this same jury would not be warranted in inferring that the absence of fluid in the reservoir was evidence of negligence, either in the constructing, assembling or inspecting of the power steering mechanism. It seems obvious that the power steering fluid did not just suddenly evaporate into thin air. I believe that the nature of the defect is such that it could logically be inferred that said defect existed prior to leaving

---

[1] The evidence showed that the median strip "was a grass surface with granite curb stones on each side."

the factory or dealership, or both, and could have been discovered through reasonable inspection.

In *Grant* v. *Malkerson Sales, Inc.* 259 Minn. 419 (decided in 1961) a situation analogous to the case at bar, the plaintiff purchased a 1957 Oldsmobile Super 88 on May 16, 1957. On May 19, 1957, after the car had been driven about 350 miles, and while the plaintiff was stopped at an intersection, the vehicle suddenly lurched forward attaining a speed up to ninety miles an hour. The plaintiff was unable to stop the vehicle and he "traveled many blocks along the city streets before . . . [the car] stopped." *Id.* at 420. The defendant General Motors argued that "the question of possibility or inference" should not "have been submitted to the jury inasmuch as no showing was made that the condition (defective carburetor assembly) which was found following the incident on May 19, 1957, existed when the Oldsmobile left the factory . . . on April 5, 1957." *Id.* at 425. The court in dismissing this contention stated, "While it is true that plaintiff produced no testimony as to the possible defective condition of the automobile when it left defendant's factory, which was more than a month prior to the date he purchased it, it appears to us that we must consider plaintiff's position in that connection. From a practical standpoint he would be faced with a serious problem if he is required to show a defect in the carburetor or accelerator linkage prior to the time the car left the factory. There is nothing in the record . . . which shows that plaintiff had any specific knowledge about the design or manufacture of the car he purchased. He had to rely to a great extent, as millions of car purchasers have to rely, upon the statements made to him by the manufacturer and the seller through their advertising and 'sales talks' as to the construction and working parts of the car. It is common knowledge among purchasers of cars that the merits and functional operations of the automobiles are never underestimated by the salesmen or by the advertising programs regarding the particular cars which are offered for sale."

"It appears to us that under the circumstances here

the plaintiff is in the position of an innocent, helpless bystander, overwhelmed by the purported legal principle put forth by General Motors that if he was unable to produce proof of a defect in the car before it left the factory the loss must lie where it falls. We cannot agree with that theory under the facts and circumstances here. Rather it is our opinion that the testimony . . . presented a rational inference that the erratic drive described . . . was caused by a car malfunction or defect which could have existed before the incident. It is our further opinion that [the] plaintiff was entitled to have the jury pass on the issue of negligence and causation on the part of General Motors." *Id.* at 425–426.

In the instant case it was impossible to introduce evidence from the driver since he was killed. Consequently, the testimony of the mechanic that "an odor of sulphur emanating from" the lack of oil in the unit and that "a clattering noise would be heard by any one in the motor vehicle" is of no import. Even if it had been possible to introduce testimony regarding "an odor of sulphur" or "a clattering noise," the automobile could have traversed a considerable distance before the driver could exercise the manual power to control its direction. It seems to me that the only reasonable and logical course to pursue in these circumstances is to do what the trial judge did, namely, submit the case to the jury and allow it to draw whatever inferences the evidence permitted. Moreover, if a plaintiff need not eliminate every other possibility in determining, by inference, that there was causation — he likewise should not be compelled to exclude every other possibility in inferring negligence. As Chief Justice Traynor stated in *Vandermark* v. *Ford Motor Co.* 61 Cal. 2d 256, 260, "since it could reasonably be inferred from the description of the . . . system in evidence and the offer of proof of all possible causes of defects that the defect was owing to negligence in design, manufacture, assembly, or adjustment, it must be taken as established that the defect was caused by some such negligence."

Because the wrongful death statute, G. L. c. 229, § 2, limits recovery to "negligence," I felt obliged to treat with the issue of "negligence" as distinguished from "warranty." It is my belief, however, that the distinction is one of shadow rather than substance. It is, at best, illogical and illusory to permit a person to recover damages for "injury to person or property proximately resulting from any breach of warranty" (G. L. c. 106, § 2–715), and yet to deny recovery, except on the theory of "negligence," for death resulting from the same cause.

I think it necessary to comment on the question of "privity of contract" referred to in the opinion. I believe that in this modern era of corporate responsibility the reliance on the technical doctrine of "privity of contract" as a curb to bar recovery in implied warranty cases should be entombed just as we have recently done with the doctrine of charitable immunity. Such a holding would reflect the realities of the market place. It is common knowledge that automobile manufacturers, as do manufacturers of a variety of other products, make direct "sales pitches" to the public through the media of mass communication. To fail to recognize that the warranties inherent in this type of mass advertising run directly from the manufacturer to the consumer is to ignore reality. This view was aptly expressed by the Supreme Court of North Dakota in the case of *Lang* v. *General Motors Corp.* 136 N. W. 2d 805, 809–810 (decided in 1965). The court there stated, "It is perfectly clear . . . that where a sale is made under a trade name and where the manufacturer has conducted a national advertising campaign and sales are accomplished through local dealers, the demand for such products is created by the advertising of the manufacturer. The purpose of the advertising conducted by such manufacturer is to cultivate the ultimate consumer. Thus, where the article sold as a new article is defectively manufactured, the interests of the ultimate consumers can be protected only by eliminating the requirement of privity between the manufacturer and his dealers and the expected ultimate consumer. It would be unreason-

able to hold that, if a buyer purchases, for example, a 'Ford' or 'Chevrolet' or 'Cadillac' or 'Chrysler' or any other make of automobile, no implied warranty of merchantable quality can be asserted by the purchaser against the manufacturer even though the particular car delivered as a new automobile is in such bad condition and so defective in materials or construction that it cannot be operated at all and is wholly useless or unsatisfactory for the ordinary purposes [for] which such automobile is designed to serve.

"Accordingly, under modern marketing conditions, when a manufacturer puts a new . . . [vehicle] or other new product into the stream of trade and promotes its sale to the public, an implied warranty that it is reasonably fit and suitable for use, as such, accompanies such new vehicle into the hands of the ultimate buyer. Absence of privity between the manufacturer and buyer is immaterial."

I would overrule the exceptions on the warranty count against the manufacturer and on the negligence counts for "wrongful death" against both defendants.