Joseph R. MORROW and Nikki Morrow,
Appellants,

v.

NEW MOON HOMES, INC., and Golden
Heart Mobile Homes, Inc., Appellees.

No. 2206.

Supreme Court of Alaska.

March 26, 1976.

Peter J. Aschenbrenner, Aschenbrenner & Savell, Fairbanks, and D. Rebecca Snow, Johnson, Christenson, Shamberg and Link, Inc., Fairbanks, for appellants.

Patrick T. Brown, Rice, Hoppner & Hedland, Fairbanks, for appellees.

Before RABINOWITZ, C. J., and CONNOR, ERWIN, BOOCHEVER, and BURKE, JJ.

RABINOWITZ, Chief Justice.

This appeal raises questions concerning personal jurisdiction over, and the liability of, a nonresident manufacturer of a defective mobile home that was purchased in Alaska from a resident seller.

In October of 1969, Joseph R. and Nikki Morrow bought a mobile home from Golden Heart Mobile Homes, a Fairbanks retailer of mobile homes. A plaque on the side of the mobile home disclosed that the home had been manufactured in Oregon by New Moon Homes, Inc. The Morrows made a down payment of $1,800, taking out a loan for the balance of the purchase price from the First National Bank of Fairbanks. The loan amount of $10,546.-49, plus interest of 9 percent per year, was to be repaid by the Morrows in 72 monthly installments of $190.13 each.

At the time of the purchase, the Morrows inspected the mobile home and noticed that the carpeting had not been laid and that several windows were broken. Roy Miller, Golden Heart's salesman, assured them that these problems would be corrected and later made good his assurances. Miller also told the Morrows that the mobile home was a "good trailer", ". . . as warm as . . . any other trailer." After the sale, Miller moved the Morrows' mobile home to Lakeview Terrace, set it up on the space the Morrows had rented, and made sure that the utilities were connected. Then the troubles started.

On the first night that the mobile home's furnace was in use, the motor went out and had to be replaced. The electric furnace installed by the manufacturer had been removed by someone who had replaced the original with an oil furnace. The furnace vent did not fit, and consequently the "stove pipe" vibrated when the furnace was running. Subsequent events showed the furnace malfunction was not the primary problem with the mobile home.

About four days after the mobile home had been set up, the Morrows noticed that the doors did not close all the way and that the windows were cracked. The bathtub

leaked water into the middle bedroom. In March of 1970 when the snow on the roof began to melt, the roof leaked. Water came in through gaps between the ceiling and the wall panels, as well as along the bottom of the wallboard. A short circuit developed in the electrical system; the lights flickered at various times. When it rained, water came out of the light fixture in the hallway. Other problems with the mobile home included the following: the interior walls did not fit together at the corners; the paneling came off the walls; the windows and doors were out of square; the door frames on the bedroom doors fell off and the closet doors would not slide properly; the curtains had glue on them; and the finish came off the kitchen cabinet doors.

Despite all these problems, the Morrows continued to live in the mobile home and make the loan payments. Golden Heart Mobile Homes was notified many times of the difficulties the Morrows were having with their mobile home. Roy Miller, the Golden Heart salesman with whom the Morrows had dealt, did put some caulking around the bathtub, but otherwise he was of little assistance. Finally, sometime before April 1, 1970, Nikki Morrow informed Miller that if Golden Heart did not fix the mobile home the Morrows wanted to return it. Miller said the Morrows would "[h]ave to take it up with the bank." Subsequently, Golden Heart went out of business.

The First National Bank of Fairbanks was more sensitive to the Morrows' plight. Upon being informed by the Morrows that they intended to make no further payments on the mobile home, bank personnel went out and inspected the home several times. In addition, on May 27, 1970, the bank wrote to New Moon Homes, Inc. in Silverton, Oregon. Its letter informed New Moon of the problems the Morrows were having with their New Moon mobile home and asked whether New Moon expected to send a representative to Fairbanks since

Golden Heart, the dealer, was no longer in business. Apparently, New Moon did not respond to the bank's letter.

A short time later the Morrows' counsel wrote a letter to New Moon Homes notifying New Moon that the Morrows intended to hold the company liable for damages for breach of implied warranties. About a month later the Morrows separated, with Nikki Morrow continuing to live in the mobile home. She continued to make payments to First National because she "couldn't afford Alaskan rents." Nikki Morrow eventually moved out of the mobile home but made no effort to sell or rent it because she considered it "not fit to live in." In October of 1971 the Morrows filed this action against both New Moon Homes and Golden Heart Mobile Homes, alleging that defendants had breached implied warranties of merchantability and fitness for particular purpose in manufacturing and selling an improperly constructed mobile home. The complaint further alleged that New Moon "is a foreign corporation doing business in the State of Alaska." Although the record does not disclose the method by which New Moon was informed of the pending action, apparently the Morrows served a copy of the summons and complaint upon the Commissioner of Commerce, who forwarded the papers to New Moon in Oregon.[1] In its answer New Moon inter alia raised the "affirmative defenses" of lack of personal jurisdiction and improper service of process.

The case was tried in July of 1973. No attorney appeared on behalf of Golden Heart Mobile Homes, but the Morrows proceeded to present their evidence against New Moon because they were looking primarily to the manufacturer for recovery. The Morrows' offered the testimony of four witnesses which tended to identify the mobile home in question as a New Moon home.[2] Neither side presented any evi-

---

1. This procedure is authorized by AS 10.05.-642.

2. Nikki Morrow testified that the plaque on the side of the mobile home identified New

dence concerning New Moon's business connections with Alaska or the circumstances under which the New Moon mobile home came into Golden Heart's possession. The superior court granted the Morrows a default judgment against Golden Heart, but dismissed their claim against New Moon "for both failure of jurisdiction and failure of privity of contract." The Morrows then appealed from that portion of the superior court's judgment which dismissed their claim against New Moon.

■ The heart of this appeal concerns the remedies which are available to a remote purchaser against the manufacturer of defective goods for direct economic loss. The superior court held that the Morrows had no legal claim against New Moon because they were not in privity of contract with New Moon. The first argument advanced here by the Morrows amounts to an end run around the requirement of privity. The Morrows contend that their complaint asserted a theory of strict liability in tort. They further argue that they should have prevailed irrespective of any lack of privity of contract between New Moon and themselves, because lack of privity of contract is not a defense to a strict tort liability claim. It is true that in *Bachner v. Pearson,* 479 P.2d 319 (Alaska 1970), we held:

> that implied warranty and strict products liability are sufficiently similar to require that a complaint worded in terms of the former theory should be deemed to raise a claim under the latter theory.[3]

Thus, although the Morrows' complaint sounded in breach of implied warranties, it also raised a strict liability claim if such a claim is legally cognizable against New Moon.

■ In *Clary v. Fifth Avenue Chrysler Center, Inc.,* 454 P.2d 244 (Alaska 1969), Alaska adopted the *Greenman v. Yuba Power Products, Inc.,*[4] rule of strict products liability, which provides that

> [a] manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being.[5]

By its terms the *Greenman* formulation applies only when the defective product causes personal injury. Since the Morrows did not sustain any personal injuries which were caused by the defects in their mobile home, strict liability is seemingly unavailable to them in the instant case. However, the Morrows argue that strict liability should nonetheless apply in the situation where a consumer sues a manufacturer solely for economic loss attributable to the manufacturer's defective product. This precise contention presents a question of first impression in Alaska.

The issue whether strict liability in tort should extend to economic loss has prompted no small amount of discussion in legal journals.[6] The two leading judicial opin-

---

Moon as its manufacturer. A friend of the Morrows who had been present at the time of the sale stated that she understood from the salesman that the home was a New Moon make. The trailer was also described as a New Moon home in the security agreement papers held by the bank and in a 1972 repair estimate drawn up by a mobile home repairman.

3. 479 P.2d at 326–27 n. 15; *cf.* Annot., Necessity and Propriety of Instructing on Alternative Theories of Negligence or Breach of Warranty, Where Instruction on Strict Liability in Tort is Given in Products Liability Case, 52 A.L.R.3d 101 (1973).

4. 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1962).

5. 454 P.2d at 247, quoting *Greenman v. Yuba Power Products, Inc.,* 59 Cal.2d 57, 27 Cal. Rptr. 697, 700, 377 P.2d 897, 900 (1962).

6. Among the better articles are: Speidel, *Products Liability, Economic Loss and the UCC,* 40 Tenn.L.Rev. 309 (1973); Prosser, *The Fall of the Citadel (Strict Liability to the Consumer),* 50 Minn.L.Rev. 791 (1966); Comment, *The Vexing Problem of Purely Economic Loss in Products Liability: An Injury in Search of a Remedy,* 4 Seton Hall L.Rev. 145 (1972); Note, *Economic Loss in Products Liability Jurisprudence,* 66 Colum.

ions are probably *Santor v. A. and M. Karagheusian, Inc.*, 44 N.J. 52, 207 A.2d 305 (1965), and *Seely v. White Motor Co.*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965). In the former case, Santor purchased from a retailer certain carpeting manufactured and advertised by Karagheusian. Almost immediately after the carpet was laid, Santor noticed an unusual line in it. As the pile wore down, the line became worse and two additional lines appeared. Since the retailer had gone out of business, Santor sued the manufacturer for damages for breach of the implied warranty of merchantability. In a unanimous decision, the Supreme Court of New Jersey held that the plaintiff, as the ultimate purchaser of defective carpeting, could maintain an action against the manufacturer on either of two theories, breach of implied warranty of reasonable fitness or strict liability in tort. Privity of contract was not necessary in order to pursue either theory, although damages were limited to loss of value of the carpeting. Although the opinion emphasized the widespread advertising carried on by Karagheusian, the *Santor* court made clear that "strict liability in tort is not conditioned upon advertising to promote sales."[7]

> [W]hen the manufacturer presents his goods to the public for sale he accompanies them with a representation that they are suitable and safe for the intended use. . . . [S]uch a representation must be regarded as implicit in their presence on the market. . . . The obligation of the manufacturer thus becomes what in justice it ought to be—an enterprise liability, and one which should not depend on the intricacies of the law of sales. The purpose of such liability is

to insure that the cost of injuries or damage, either to the goods sold or to other property, resulting from defective products, is borne by the makers of the products who put them in the channels of trade, rather than by the injured or damaged persons who ordinarily are powerless to protect themselves.[8]

Barely four months after *Santor* came down, its strict liability holding was rejected by the Supreme Court of California in *Seely v. White Motor Co., supra.* Seely purchased a truck manufactured by White Motor Co. for use in his heavy duty hauling business. Upon taking possession of the truck, Seely found that it bounced violently. This "galloping" continued for 11 months until the truck's brakes failed and the truck overturned, sustaining in excess of $5,000 in damages. Seely was not injured in the incident.

Seely sued White Motor Co. seeking damages for the cost of repairing the truck and for both the money paid on the purchase price and the profits lost in his business because he was unable to make normal use of the truck. The Supreme Court of California affirmed the trial court's award of damages in the amount of the payments made plus lost profits, on the grounds that White Motor Co. had breached an express warranty to Seely, the ultimate purchaser. The majority opinion, written by Chief Justice Traynor, condemned in broad *dicta Santor's* application of strict liability principles to a case involving only economic loss:

> The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the 'luck' of one plaintiff in having an

---

L.Rev. 917 (1966); Comment, *Manufacturers' Liability to Remote Purchasers for 'Economic Loss' Damages—Tort or Contract?*, 114 U.Pa.L.Rev. 539 (1966).

Other articles on the subject include: Note, *Products Liability in Oregon: Present and Future*, 8 Willamette L.J. 410 (1972); Comment, 7 Creighton L.Rev. 396 (1974); Note, *Economic Loss from Defective Products*, 4

Willamette L.J. 402 (1967); Note, *The Demise of Vertical Privity: Economic Loss Under the Uniform Commercial Code*, 2 Hofstra L.Rev. 749 (1974). *See also* W. Prosser, Law of Torts 664–67 (4th ed. 1971).

7. 207 A.2d at 312.

8. 207 A.2d at 311–12 (citation omitted).

accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands. A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will.[9]

*Seely* appears to enjoy the support of the vast majority of the other courts which have considered the question whether strict liability in tort should extend to instances of economic loss.[10] We also prefer the result in *Seely*, although our reasoning differs slightly in emphasis from that of the *Seely* court. Under the Uniform Commercial Code the manufacturer is given the right to avail himself of certain affirmative defenses which can minimize his liability for a purely economic loss. Specifically, the manufacturer has the opportunity, pursuant to AS 45.05.100, to disclaim liability and under AS 45.05.230 to limit the consumer's remedies, although the Code further provides that such disclaimers and limitations cannot be so oppressive as to be unconscionable and thus violate AS 45.05.-072. In addition, the manufacturer is entitled to reasonably prompt notice from the consumer of the claimed breach of warranties, pursuant to AS 45.05.174(c)(1).[11]

In our view, recognition of a doctrine of strict liability in tort for economic loss would seriously jeopardize the continued

9. 45 Cal.Rptr. at 23, 403 P.2d at 151.

10. *See, e. g., Bright v. Goodyear Tire & Rubber Co.,* 463 F.2d 240 (9th Cir. 1972) (buyer of an automobile allegedly having defective tires could not sue under California law the tire manufacturer in strict liability because the buyer did not allege he had suffered physical injury); *Eli Lilly & Co. v. Casey,* 472 S.W.2d 598 (Tex.Civ.App.1971) (buyer of weed control chemical may not sue the manufacturer on a strict liability theory to recover damages for economic loss); *Melody Home Mfg. Co. v. Morrison,* 455 S.W.2d 825 (Tex.Civ.App.1970) (purchaser of house trailer cannot hold manufacturer strictly liable in tort where only injury was economic loss); *Rhodes Pharmacal Co. v. Continental Can Co.,* 72 Ill.App.2d 362, 219 N.E.2d 726 (1966) (damages for leaking aerosol cans could not be recovered from the manufacturer of the cans on the basis of strict liability, but held that case could proceed on theory of breach of implied warranty of fitness); *Price v. Gatlin,* 241 Or. 315, 405 P.2d 502 (1965) (wholesaler could not be held liable to the buyer on a strict liability theory for economic loss). The cases are collected in Annot., Privity of Contract as Essential in Action Against Remote Manufacturer or Distributor for Defects in Goods Not Causing Injury to Person or to Other Property, 16 A.L.R.3d 683 (1967).

Only one case follows the *Santor* decision, *Cova v. Harley Davidson Motor Co.,* 26 Mich.App. 602, 182 N.W.2d 800 (1970). Notwithstanding lack of privity, other courts have permitted suits against the manufacturer of a product, based on a misrepresentation theory, where the product has been widely advertised and the buyer relied on the advertising. *See, e. g., Ford Motor Co. v. Lonon,* 217 Tenn. 400, 398 S.W.2d 240 (1966); *Randy Knitwear, Inc. v. American Cyanamid Co.,* 11 N.Y.2d 5, 226 N.Y.S.2d 363, 181 N.E.2d 399 (1962). The misrepresentation theory has no application here because the Morrows have made no showing that they were aware of, or relied on, advertising by New Moon.

11. These disclaimer, liability limitation and notice rights of the manufacturer are not abrogated by a relaxation of the privity requirement in the realm of warranty liability, and might, within the confines of the doctrine of unconscionability, be available to the manufacturer against the remote purchaser suing on a theory of implied warranties. We will treat this matter in more detail subsequently. *See* Comment, *The Vexing Problem of the Purely Economic Loss In Products Liability: An Injury in Search of a Remedy,* 4 Seton Hall L.Rev. 145, 173–74 (1972).

viability of these rights. The economically injured consumer would have a theory of redress not envisioned by our legislature when it enacted the U.C.C., since this strict liability remedy would be completely unrestrained by disclaimer, liability limitation and notice provisions. Further, manufacturers could no longer look to the Uniform Commercial Code provisions to provide a predictable definition of potential liability for direct economic loss. In short, adoption of the doctrine of strict liability for economic loss would be contrary to the legislature's intent when it authorized the aforementioned remedy limitations and risk allocation provisions of Article II of the Code. To extend strict tort liability to reach the Morrows' case would in effect be an assumption of legisative prerogative on our part and would vitiate clearly articulated statutory rights.[12] This we decline to do. Thus, we hold that the theory of strict liability in tort which we recognized in *Clary* does not extend to the consumer who suffers only economic loss because of defective goods.[13]

The principal theory of liability advocated by the Morrows at trial was that New Moon had breached statutory warranties which arose by operation of law with the manufacture and distribution of this mobile home. Specifically, the Morrows rely upon AS 45.05.096 and AS 45.05.098 of the Uniform Commercial Code as enacted in Alaska. The former section provides for an implied warranty of "merchantability" in the sale of goods governed by the Code;[14] the latter establishes an implied warranty that the goods are fit for the particular purpose for which they were purchased.[15] The superior court was of the view that these Code warranties operated only for the benefit of those purchasing directly from a manufacturer or seller. Since the Morrows were not in privity of contract with New Moon, the superior court concluded that a warranty theory based on AS 45.05.096 and AS 45.05.098 could not serve as a basis for liability.

■ There is little question that the Code applies to the distribution of mobile

12. Our decision in *Clary v. Fifth Avenue Chrysler Center, Inc.*, 454 P.2d 244 (Alaska 1969), in which we approved strict liability in tort for personal injuries, was not in derogation of these rights, for the reason that a manufacturer has no right to disclaim or limit the liability for personal injury. The Code provides that such restrictions are prima facie unconscionable, AS 45.05.230(c), and they are rarely upheld by the courts. *See generally*, Braucher, *The Unconscionable Contract or Terms*, 31 U.Pitt.L.Rev. 337 (1970); Lauer, *Sales Warranties Under the Uniform Commercial Code*, 30 Mo.L.Rev. 236 (1965); Leff, *Unconscionability and the Code—The Emperor's New Clause*, 115 U.Pa. L.Rev. 485 (1967); Murray, *Unconscionability, Unconscionability*, 31 U.Pitt.L.Rev. 1 (1968); Spanogle, *Analyzing Unconscionability Problems*, 117 U.Pa.L.Rev. 931 (1969).

13. *See also Hawkins Constr. Co. v. Matthews Co., Inc.*, 190 Neb. 546, 209 N.W.2d 643, 651–54 (1973).

14. AS 45.05.096 provides:
 (a) Unless excluded or modified (§ 100), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving

for value of food or drink to be consumed either on the premises or elsewhere is a sale.
 (b) Goods to be merchantable must at least
 (1) pass without objection to the trade under the contract description;
 (2) in the case of fungible goods, be of fair average quality within the description;
 (3) be fit for the ordinary purposes for which the goods are used;
 (4) run, within the variations permitted by the agreement, of even kind, quality, and quantity within each unit and among all units involved;
 (5) be adequately contained, packaged, and labeled as the agreement requires; and
 (6) conform to the promises or affirmations of fact made on the container or label.
 (c) Unless excluded or modified (§ 100), other implied warranties may arise from course of dealing or usage of trade.

15. AS 45.05.098 provides:
 If the seller at the time of contracting has reason to know a particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is, unless excluded or modified under § 100 of this chapter, an implied warranty that the goods shall be fit for that purpose.

homes. New Moon qualifies as a "merchant" within the meaning of the relevant section, AS 45.05.042, and mobile homes, being highly movable, are "goods" as defined in AS 45.05.044.[16] Further, in *George v. Willman*, 379 P.2d 103 (Alaska 1963), we held that the implied warranty of merchantable quality established by the Code's predecessor, the Uniform Sales Act,[17] was fully applicable to the sale of mobile homes.[18] The result is no different under AS 45.05.096 and AS 45.05.098 of the Code.[19]

 It is equally clear that in this jurisdiction the Morrows, as immediate purchasers, can recover against their seller for breach of the Code's implied warranties. Indeed, this was the theory upon which the default judgment against Golden Heart Mobile Homes was predicated.[20] The critical question in this case is whether the Morrows, as remote purchasers, can invoke the warranties attributable to the manufacturer which arose when New Moon passed title of the mobile home to the next party in the chain of distribution.[21] In other words, do the implied warranties of merchantability and fitness run from a manufacturer only to those with whom the manufacturer is in privity of contract?

 Although sometimes criticized,[22] the distinction between horizontal and vertical privity is significant in this case. The issue of horizontal privity raises the question whether persons other than the buyer of defective goods can recover from the buyer's immediate seller on a warranty theory. The question of vertical privity is whether parties in the distributive chain prior to the immediate seller can be held liable to the ultimate purchaser for loss caused by the defective product.[23] The Code addresses the matter of horizontal privity in AS 45.05.104, extending the claim for relief in warranty to any ". . . person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that the person may use, consume, or be affected by the goods . . . ." With regard to vertical privity, the Code is totally silent and strictly neutral, as Official Comment 3 to AS 45.05.104 makes eminently clear.[24] The Code leaves to the courts the question

---

16. *Apeco Corp. v. Bishop Mobile Homes, Inc.*, 506 S.W.2d 711 (Tex.Civ.App.1974). *See* Note, *Mobilehomes: Present Regulation and Needed Reforms*, 27 Stan.L.Rev. 159, 163 (1974); Note, *Products Liability—Mobile Homes a Neglected Product?*, 3 Memphis State U.L.Rev. 92, 97–101 (1972).

17. The Uniform Sales Act (Sections 29–1–1 through 29–1–189 A.C.L.A.1949, as amended, S.L.A.1955, ch. 96 § 2) was effective until superseded by the Uniform Commercial Code on January 1, 1963. § 10.101 ch. 114 S.L.A. 1962.

18. *See also Eggen v. M & K Trailers and Mobile Home Brokers, Inc.*, 29 Cal.App. 177, 482 P.2d 435 (1971); *Beck v. Spindler*, 256 Minn. 543, 99 N.W.2d 670 (1959); *Wade v. Chariot Trailer Co.*, 331 Mich. 576, 50 N.W. 2d 162 (1951).

19. *Cf. Minsel v. El Rancho Mobile Home Center, Inc.*, 32 Mich.App. 10, 188 N.W.2d 9 (1971) (applying other provisions of the Code to a mobile home sales transaction).

20. *See also Alaska Rent-A-Car, Inc. v. Ford Motor Co.*, 526 P.2d 1136 (Alaska 1974);

*Sinka v. Northern Commercial Co.*, 491 P.2d 116 (Alaska 1971).

21. The facts developed in this case do not disclose whether New Moon sold the mobile home directly to Golden Heart or through an intermediate wholesaler. In either event, the parties do not dispute that at the time of the transaction in question title was lodged with Golden Heart. Necessarily, therefore, New Moon "sold" the home within the meaning of AS 45.05.046 to someone, consequently its sale generated the implied warranties of Article II of the Code.

22. *Salvador v. J. H. English of Phila., Inc.*, 224 Pa.Super. 377, 307 A.2d 398 (1973), *aff'd*, 457 Pa. 24, 319 A.2d 903 (1974).

23. *See Kassab v. Central Soya*, 432 Pa. 217, 246 A.2d 848 (1968); J. White & R. Summers, Uniform Commercial Code, § 11–2, at 327 (1972).

24. Although Alaska's legislature did not enact the Official Comments as part of Title 45, and we do not find them necessarily controlling in all instances in interpreting the Code, they are of persuasive assistance in

of the extent to which vertical privity of contract will or will not be required.[25]

This court has never previously confronted the question whether a requirement of privity of contract will preclude a purchaser from recovering against the original manufacturer on a theory of implied warranties. As mentioned previously, we expressly held in *Clary v. Fifth Avenue Chrysler Center, Inc.*, 454 P.2d 244 (Alaska 1969), that a manufacturer is strictly liable in tort for personal injuries attributable to his defective goods. In approving a theory based on strict liability in tort, we stressed the efficacy, simplicity, and comprehensiveness of that theory. Appellees in *Clary* had urged this court to limit the consumer's source of redress to possible application of the statutory provisions governing sales warranties, particularly AS 45.05.096. This we declined to do. As we have noted, under the statutory scheme an injured consumer is required to give notice of the defect to the warrantor within a relatively short period of time, and potential

liability may be circumscribed by express disclaimers from the manufacturer. The *Clary* court was concerned that such provisions might operate as a trap for the unwary,[26] and it expressed a preference for a tort theory more solicitous of the needs of the consumer in the modern, prepackaged, mass merchandised market place. However, this preference was never intended to imply that reliance on the statutory warranty provisions was not available as an alternative vehicle for relief. There is nothing incompatible in affording parallel consumer remedies sounding in tort and in contract, and several jurisdictions which have adopted strict liability in tort also make available an implied warranty theory without regard to privity of contract.[27]

The dispute here is whether the requirement of vertical privity of contract should be abolished in Alaska. This battle has already been waged in many jurisdictions, and the results are well known: the citadel of privity has largely toppled.[28] The course of this modern development is fa-

construction and application of the Code. *See A & G Constr. Co. v. Reid Brothers Logging Co.*, 547 P.2d 1207 (Alaska 1976); *Bachner v. Pearson*, 479 P.2d 319, 327 n. 18 (Alaska 1970); *National Car Rental v. Fox*, 18 Ariz.App. 160, 500 P.2d 1148 (1972); *First Nat'l Bank v. Smoker*, 153 Ind.App. 71, 286 N.E.2d 203 (1972).

25. *Suvada v. White Motor Co.*, 51 Ill.App.2d 318, 201 N.E.2d 313 (1964), *aff'd*, 32 Ill.2d 612, 210 N.E.2d 182 (1965); *Kassab v. Central Soya*, 432 Pa. 217, 246 A.2d 848 (1968). By this statement we do not mean to intimate that the matter of horizontal privity is exclusively controlled by AS 45.05.-104. The fact that a given plaintiff is not expressly authorized to sue for breach of warranty under that provision will not preclude this court from possibly holding at some future date, as a matter of case law, that plaintiff is not barred by a requirement of horizontal privity. *See Haragan v. Union Oil Co.*, 312 F.Supp. 1392 (D.Alaska 1970); R. Anderson, Uniform Commercial Code, § 2-318:6 at 732 (1970); Franklin, *When Worlds Collide: Liability Theories and Disclaimers in Defective-Product Cases*, 18 Stan. L.Rev. 974, 999-1000 (1966); Eyer, *The Impact of the Uniform Commercial Code as*

*the California Law of Sales Warranties*, 8 U.C.L.A.L.Rev. 281, 322-28 (1961).

26. W. Prosser, Law of Torts § 97 at 655 (4th ed. 1971).

27. For example, New Jersey revolutionized the law of implied warranties with its landmark decision in *Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 161 A.2d 69 (1960), yet it has embraced strict tort liability as well. *See Schipper v. Levitt & Sons, Inc.*, 44 N.J. 70, 207 A.2d 314 (1965); *Santor v. A. & M. Karagheusian, Inc.*, 44 N. J. 52, 207 A.2d 305 (1965). Iowa is another example. *Compare State Farm Mut. Auto. Ins. Co. v. Anderson-Weber, Inc.*, 252 Iowa 1289, 110 N.W.2d 449 (1961) (warranty theory, privity of contract abolished) *with Kleve v. General Motors Corp.*, 210 N.W.2d 568 (strict liability in tort). *But cf. Christofferson v. Kaiser Foundation Hospitals*, 15 Cal.App.3d 75, 92 Cal.Rptr. 825 (1971).

28. W. Prosser, *supra* note 26, § 97, at 655 (". . . 'citadel of privity' has fallen"); *Kassab v. Central Soya*, 432 Pa. 217, 246 A.2d 848, 852 (1968) (". . . all but crumbled to dust"); Annot., 16 A.L.R.3d 683, 687 (1967) (". . . all but razed. . . .").

miliar history and we need not recount it at length here.[29] Contrived "exceptions" which paid deference to the hoary doctrine of privity while obviating its unjust results have given way in more recent years to an open frontal assault.[30] The initial attack came in *Spence v. Three Rivers Builders & Masonry Supply, Inc.,* 353 Mich. 120, 90 N. W.2d 873 (1958), but the leading case probably remains *Henningsen v. Bloomfield Motors, Inc.,* 32 N.J. 358, 161 A.2d 69 (1960), in which the New Jersey Supreme Court held liable for personal injuries and property damages both the manufacturer of an automobile and the dealer who sold the vehicle. The rationale for the widespread abolition of the requirement of privity stems from the structure and operation of the free market economy in contemporary society; it was succinctly summed up not long ago by the Supreme Court of Pennsylvania: [31]

Courts and scholars alike have recognized that the typical consumer does not deal at arms length with the party whose product he buys. Rather, he buys from a retail merchant who is usually little more than an economic conduit. It is not the merchant who has defectively manufactured the product. Nor is it usually the merchant who advertises the product on such a large scale as to attract consumers. We have in our society literally scores of large, financially responsible manufacturers who place their wares in the stream of commerce not only with the realization, but with the avowed purpose, that these goods will find their way into the hands of the consumer. Only the consumer will use these products; and only the consumer will be injured by them should they prove defective.

█ The policy considerations which dictate the abolition of privity are largely those which also warranted imposing strict tort liability on the manufacturer: the consumer's inability to protect himself adequately from defectively manufactured goods, the implied assurance of the maker when he puts his goods on the market that they are safe, and the superior risk bearing ability of the manufacturer.[32] In addition, limiting a consumer under the Code to an implied warranty action against his immediate seller in those instances when the product defect is attributable to the manufacturer would effectively promote circularity of litigation and waste of judicial resources. Therefore, we decide that a manufacturer may be held liable for a breach of the implied warranties of AS 45.05.096 and AS 45.05.098 without regard to privity of contract between the manufacturer and the consumer.

█ The more difficult question before this court is whether we should extend this abolition of privity to embrace not only warranty actions for personal injuries and property damage but also those for economic loss. Contemporary courts have been more reticent to discard the privity requirement and to permit recovery in warranty by a remote consumer for purely economic losses.[33] In considering this issue we note that economic loss may be categorized into direct economic loss and consequential economic loss, a distinction maintained in the Code's structure of dam-

29. *See* Franklin, *When Worlds Collide: Liability Theories and Disclaimers in Defective-Product Cases,* 18 Stan.L.Rev. 974, 975–79 (1966); Prosser, *The Fall of the Citadel of Privity (Strict Liability to the Consumer),* 50 Minn.L.Rev. 791 (1966); Jaeger, *Privity of Warranty: Has the Tocsin Sounded?,* 1 Duquesne L.Rev. 1 (1963); Prosser, *The Assault Upon the Citadel, (Strict Liability to the Consumer),* 69 Yale L.J. 1099 (1960).

30. At one time there were evidently at least 29 such exceptions. *See* Gillam, *Products Liability in a Nutshell,* 37 Ore.L.Rev. 119, 153–55 (1958).

31. *Kassab v. Central Soya,* 432 Pa. 217, 246 A.2d 848, 853 (1968) (footnote omitted).

32. *Id.* at 854 n. 6; *Miller v. Preitz,* 422 Pa. 383, 393, 221 A.2d 320, 325 (1966).

33. Comment, *The Vexing Problem of the Purely Economic Loss in Products Liability: An Injury in Search of a Remedy,* 4 Seton Hall L.Rev. 145, 154 (1972); Annot., 16 A.L.R.3d 683, 687 (1967).

age remedies.[34] One commentator has summarized the distinction:

Direct economic loss may be said to encompass damage based on insufficient product value; thus, direct economic loss may be 'out of pocket'—the difference in value between what is given and received—or 'loss of bargain'—the difference between the value of what is received and its value as represented. Direct economic loss also may be measured by costs of replacement and repair. Consequential economic loss includes all indirect loss, such as loss of profits resulting from inability to make use of the defective product.[35]

The claim of the Morrows in this case is one for direct economic loss.

A number of courts recently confronting this issue have declined to overturn the privity requirement in warranty actions for economic loss.[36] One principal factor seems to be that these courts simply do not find the social and economic reasons which justify extending enterprise liability to the victims of personal injury or property damage equally compelling in the case of a disappointed buyer suffering "only" economic loss.[37] There is an apparent fear that economic losses may be of a far greater magnitude in value than personal injuries, and being somehow less foreseeable these losses would be less insurable, undermining the risk spreading theory of enterprise liability.[38]

 Several of the courts which have recently considered this aspect of the

---

34. AS 45.05.220(b) provides:

The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

This is the measure of damages ordinarily provided by the Code for the consumer who purchases and accepts goods and then sues because the goods are not as warranted. Frequently the measure is determined by reference to the cost of repairs. J. White and R. Summers, Uniform Commercial Code § 10–1 at 306, 308 (1972).

AS 45.05.220(c) provides that in a "proper case" consequential damages may also be recovered. Consequential damages are defined by AS 45.05.222(b) as including

(1) loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(2) injury to person or property proximately resulting from a breach of warranty.

The item of consequential damage most frequently sought is lost profits attributable to the warranty breach. J. White and R. Summers, *supra*, § 10–4 at 319.

35. Note, *Economic Loss in Products Liability Jurisprudence*, 66 Colum.L.Rev. 917, 918 (1966).

36. *Koellmer v. Chrysler Motors Corp.*, 6 Conn.Cir. 478, 276 A.2d 807 (1970); *General Motors Corp. v. Halco Instruments, Inc.*, 124 Ga.App. 630, 185 S.E.2d 619 (1971); *Neck-*

tas v. General Motors Corp.*, 357 Mass. 546, 259 N.E.2d 234 (1970); *Hupp Corp. v. Metered Washer Service*, 256 Or. 245, 472 P.2d 816 (1970); *State ex rel. Western Seed Prod. Corp. v. Campbell*, 250 Or. 262, 442 P.2d 215 (1968); *Price v. Gatlin*, 241 Or. 315, 405 P.2d 502 (1965); *Henry v. John W. Eshelman & Sons*, 99 R.I. 518, 209 A.2d 46 (1965); *Dimoff v. Ernie Majer, Inc.*, 55 Wash.2d 385, 347 P.2d 1056 (1960).

37. *See, e. g., State ex rel. Western Seed Prod. Corp. v. Campbell*, 250 Or. 262, 442 P.2d 215 (1968) and *Price v. Gatlin*, 241 Or. 315, 405 P.2d 502 (1965). In the latter case Justice Holman tried to elucidate the distinction in a concurring opinion at 504:

In establishing liability in personal injury cases courts have been motivated to overlook any necessity for privity because the hazard to life and health is usually a personal disaster of major proportions to the individual both physically and financially and something of minor importance to the manufacturer or wholesaler against which they can protect themselves by a distribution of risk through the price of the article sold. There has not been the same social necessity to motivate the recovery for strict economic losses where the damaged person's health, and therefore his basic earning capacity, has remained unimpaired.

*See also Seely v. White Motor Co.*, 63 Cal. 2d 9, 45 Cal.Rptr. 17, 23, 403 P.2d 145, 151 (1965).

38. J. White and R. Summers, Uniform Commercial Code, § 11–5 at 334 (1972); Note, *Economic Loss in Products Liability Jurisprudence*, 66 Colum.L.Rev. 917, 964–65 (1966) and cases discussed therein.

privity issue have found those arguments unpersuasive.[39] We are in agreement and hold that there is no satisfactory justification for a remedial scheme which extends the warranty action to a consumer suffering personal injury or property damage but denies similar relief to the consumer "fortunate" enough to suffer only direct economic loss. Justice Peter's separate opinion in *Seely v. White Motor Co.*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 24, 403 P.2d 145, 152 (1965), persuasively establishes that the cleavage between economic loss and other types of harm is a false one, that each species of harm can constitute the "overwhelming misfortune" in one's life which warrants judicial redress. The Supreme Court of New Jersey is also in complete agreement with this view:

> From the standpoint of principle, we perceive no sound reason why the implication of reasonable fitness should be attached to the transaction and be actionable against the manufacturer where the defectively made product has caused personal injury and not actionable when inadequate manufacture has put a worthless article in the hands of an innocent purchaser who has paid the required price for it. In such situations considerations of justice require a court to interest itself in originating causes and to apply the principle of implied warranty on that basis, rather than to test its applica-

tion by whether personal injury or simply loss of bargain resulted in the breach of the warranty. True, the rule of implied warranty had its gestative stirrings because of the greater appeal of the personal injury claim. But, once in existence, the field of operation of the remedy should not be fenced in by such a factor.[40]

The fear that if the implied warranty action is extended to direct economic loss, manufacturers will be subjected to liability for damages of unknown and unlimited scope would seem unfounded. The manufacturer may possibly delimit the scope of his potential liability by use of a disclaimer in compliance with AS 45.05.100 or by resort to the limitations authorized in AS 45.05.230. These statutory rights not only preclude extending the theory of strict liability in tort, *supra*, but also make highly appropriate this extension of the theory of implied warranties. Further, by expanding warranty rights to redress this form of harm, we preserve ". . . the well developed notion that the law of contract should control actions for purely economic losses and that the law of tort should control actions for personal injuries."[41] We therefore hold that a manufacturer can be held liable for direct economic loss attributable to a breach of his implied warranties, without regard to privity of contract between the manufacturer and the ultimate

---

39. *Lynne Carol Fashions, Inc. v. Cranston Print Works Co.*, 453 F.2d 1177 (3d Cir. 1972) (stating Pennsylvania law) ; *Gherna v. Ford Motor Co.*, 246 Cal.App.2d 639, 55 Cal.Rptr. 94 (1966) ; *Manheim v. Ford Motor Co.*, 201 So.2d 440 (Fla.1967) ; *Hoskins v. Jackson Grain Co.*, 63 So.2d 514 (Fla.1953) ; *Smith v. Platt Motors, Inc.*, 137 So.2d 239 (Fla.App.1962) ; *Continental Copper & Steel Industries, Inc. v. E. C. "Red" Cornelius, Inc.*, 104 So.2d 40 (Fla.App. 1958) ; *Rhodes Pharmacal Co. v. Continental Can Co.*, 72 Ill.App.2d 362, 219 N.E.2d 726 (1966) ; *State Farm Mut. Auto. Ins. Co. v. Anderson-Weber, Inc.*, 252 Iowa 1289, 110 N.W.2d 449 (1961) ; *Spence v. Three Rivers Builders & Masonry Supply, Inc.*, 353 Mich. 120, 90 N.W.2d 873 (1958) ; *Cova v. Harley Davidson Motor Co.*, 26 Mich.App.

602, 182 N.W.2d 800 (1970) ; *Beck v. Spindler*, 256 Minn. 543, 99 N.W.2d 670 (1959) ; *Santor v. A. & M. Karagheusian, Inc.*, 44 N.J. 52, 207 A.2d 305 (1965) ; *Lang v. General Motors Corp.*, 136 N.W.2d 805 (N.D. 1965) ; *Kassab v. Central Soya*, 432 Pa. 217, 246 A.2d 848 (1968) ; *Ford Motor Co. v. Grimes*, 408 S.W.2d 313 (Tex.Civ.App.1966).

40. *Santor v. A. & M. Karagheusian, Inc.*, 44 N.J. 52, 60, 207 A.2d 305, 309 (1965). See also *Lang v. General Motors Corp.*, 136 N.W. 2d 805 (N.D.1965) ; Note, *Economic Loss in Products Liability Jurisprudence*, 66 Colum. L.Rev. 917, 964 (1966).

41. Comment, *The Vexing Problem of Purely Economic Loss in Products Liability: An Injury in Search of a Remedy*, 4 Seton Hall L.Rev. 145, 175 (1972).

**292**

purchaser.[42] It was therefore error for the trial court to dismiss the Morrows' action against New Moon for want of privity.

■ Our decision today preserves the statutory rights of the manufacturer to define his potential liability to the ultimate consumer, by means of express disclaimers and limitations, while protecting the legitimate expectation of the consumer that goods distributed on a wide scale by the use of conduit retailers are fit for their intended use. The manufacturer's rights are not, of course, unfettered. Disclaimers and limitations must comport with the relevant statutory prerequisites and cannot be so oppressive as to be unconscionable within the meaning of AS 45.05.072.[43] On the other hand, under the Code the consumer has a number of responsibilities if he is of enjoy the right of action we recognize today, not the least of which is that he must give notice of the breach of warranty to the manufacturer pursuant to AS 45.05.-174(c)(1). The warranty action brought under the Code must be brought within the statute of limitations period prescribed in AS 45.05.242. If the action is for breach of the implied warranty of fitness for particular purpose, created by AS 45.05.098, the consumer must establish that the warrantor had reason to know the particular

purpose for which the goods were required and that the consumer relied on the seller's skill or judgment to select or furnish suitable goods.[44] In the case of litigation against a remote manufacturer, it would appear that often it will be quite difficult to establish this element of actual or constructive knowledge essential to this particular warranty.

In the case at bar the trial judge failed to enter written findings of fact, as are required by Alaska Rule of Civil Procedure 52. We cannot determine from the record whether the Morrows would have prevailed on a theory of breach of implied warranties had the trial court not erred in raising the barrier of privity. Trial was had over two years ago. We are therefore of the opinion that, if the dismissal for want of jurisdiction was also erroneous, a new trial is warranted at which the Morrows will have the opportunity to assert their warranty theories free from the confines of privity. It is to the jurisdictional ruling that we now turn.

The Morrows sought to establish personal jurisdiction over New Moon by invoking Alaska's long arm statute, particularly AS 09.05.015(a)(4), which provides:

A court of this state having jurisdiction over the subject matter has jurisdic-

---

42. We recognize that the arguments against the abolition of privity are more compelling when the injury alleged is damages of a consequential nature many times the value of the manufacturer's product. *See, e. g.,* Note, *Economic Loss in Products Liability Jurisprudence,* 66 Colum.L.Rev. 917, 965–66 (1965). We do not speak today to the issue of consequential economic loss, other than to note that AS 45.05.222 governs the recovery of such damages and requires, among other things, that said damages must have been foreseeable by the manufacturer. *Adams v. J. I. Case Co.,* 125 Ill.App.2d 388, 261 N.E. 2d 1 (1970).

43. It is incumbent on the courts of Alaska to enforce the provisions of the Uniform Commercial Code when applicable, including the doctrine of unconscionability embodied in AS 45.05.072. Particularly close judicial scrutiny is warranted when a manufacturer exacts

a liability disclaimer or remedy limitation from a consumer who enjoys little or no bargaining power in the market place. As one court has observed:

Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party. *Williams v. Walker-Thomas Furniture Co.,* 121 U.S.App.D.C. 315, 350 F.2d 445, 449 (1965) (Wright, J.). *See also Unico v. Owen,* 50 N.J. 101, 232 A.2d 405 (1967); *Electronics Corp. of America v. Lear Jet Corp.,* 55 Misc.2d 1066, 286 N.Y.S.2d 711 (Sup.Ct.1967); Comment, *The Vexing Problem of the Purely Economic Loss in Products Liability: An Injury in Search of a Remedy,* 4 Seton Hall L.Rev. 145, 181–83 (1967).

44. *Prince v. LeVan,* 486 P.2d 959 (Alaska 1971).

tion over a person served in an action according to the rules of civil procedure

. . . . . .

(4) in an action claiming injury to person or property in this state arising out of an act or omission out of this state by the defendant, provided, in addition, that at the time of the injury either

(A) solicitation or service activities were carried on in this state by or on behalf of the defendant; or

(B) products, materials or things processed, served or manufactured by the defendant were used or consumed in this state in the ordinary course of trade.

This statutory provision was interpreted in *Jonz v. Garrett/Airesearch Corp.*, 490 P.2d 1197 (Alaska 1971), which involved an airplane manufactured in Arizona by Hamilton Aircraft Corporation and leased to an Alaskan resident. The aircraft crashed on Alaska's North Slope and the Alaskan lessee brought suit in Fairbanks against Hamilton for damages attributable to negligent manufacture and design of the aircraft. Personal jurisdiction was based on AS 09.05.015(a)(4) and service was by way of Alaska's Commissioner of Commerce. The superior court set aside the service and dismissed the suit for want of personal jurisdiction, but this court reversed, holding the exercise of personal jurisdiction proper under the statute and consistent with due process.

Chief Justice Boney, writing for the court in *Jonz*, employed a two-stage analy-

sis. First, he focused upon whether the jurisdictional requisites of AS 09.05.-015(a)(4) were satisfied. The damage to the aircraft supplied the "injury to . . . property" required by the statute. This injury coupled with

[t]he solicitation activities carried on by or on behalf of Hamilton Aircraft in Alaska and the known use in Alaska of two of the Hamilton manufactured Turboliners in the ordinary course of trade provided a sufficient basis for obtaining personal jurisdiction under the terms of Alaska's long arm statute.[45]

Second, the court turned to the question whether the application of Alaska's long arm statute to the nonresident manufacturer would violate the due process clause of the 14th Amendment to the federal constitution. In so doing, the *Jonz* court restated the familiar test articulated by the United States Supreme Court in *International Shoe Co. v. Washington*[46] and its progeny:[47]

[D]ue process is satisfied when a nonresident defendant has established minimum contacts with the forum state 'such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'[48]

Having previously held that the Alaska long arm statute is an assertion of jurisdiction to the maximum extent permitted by due process,[49] this court noted:

45. 490 P.2d at 1199.

46. 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

47. *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154 (1950); *McGee v. International Life Ins. Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *See also* Note, *In Personam Jurisdiction Over Nonresident Manufacturers in Product Liability Actions*, 63 Mich.L.Rev. 1028 (1965).

48. 490 P.2d at 1199, quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95, 102 (1945).

49. *Stephenson v. Duriron Co.*, 401 P.2d 423, 424 (Alaska 1965); *Northern Supply, Inc. v. Curtiss-Wright Corp.*, 397 P.2d 1013, 1016–17 (Alaska 1965) (holding that AS 10.05.642, the service of process statute, extends jurisdiction of Alaska courts to "the outer limits of the due process clause of the federal constitution"). *Accord Jones Enterprises, Inc. v. Atlas Serv. Corp.*, 442 F.2d 1136 (9th Cir. 1971). In *Jones Enterprises*, AS 09.05.015 was construed to confer long arm jurisdiction over a subcontractor who prepared engineering designs and drawings outside Alaska for an Anchorage apartment house that collapsed during the 1964 earthquake. Although the designs and drawings were supplied to another contractor outside Alaska, the fact

The occurrence of an injury in Alaska allegedly caused by an act or omission by a defendant outside of Alaska is of itself a contact with Alaska. While such a contact is not sufficient, taken alone, to establish minimum contacts with Alaska, very little by way of additional contacts need be shown to satisfy due process.[50] Evidence that Hamilton Aircraft knew that the airplane in question was being operated in Alaska, and that such use was entirely foreseeable, was held to be sufficient additional contact to establish minimum contacts with Alaska.

In the case at bar the trial court was of the opinion that personal jurisdiction was not established by the evidence adduced. Precious little evidence was offered on the issue at all, in large measure because of a dispute between the parties concerning the burden of proving jurisdiction. Each side contended and continues to contend that the burden of proof in the first instance devolved upon the other.

■■■ Although this court has not previously had the occasion to speak to this issue, the law seems rather clear. Alaska Rule of Civil Procedure 12(b) requires the defendant to plead the defense of lack of personal jurisdiction in its answer or by motion, at the peril of waiving the defense pursuant to Rule 12(h). Once the defendant has put into dispute the court's power over a nonresident defendant, however, the burden falls on the plaintiff to establish, perhaps by resort to the long arm statute, a prima facie case of personal jurisdiction.[51] We note that when the challenge comes in the form of a motion to quash long arm service of process pursuant to AS 10.05.-642, the burden on the plaintiff is precisely the same: to establish that the Alaskan statute constitutionally conveys on the trial court jurisdiction over this nonresident defendant.[52] In either instance, the burden is on the plaintiff to come forward with jurisdictional evidence.

■■■ In its answer the defendant denied that New Moon was a foreign corporation doing business in Alaska and also alleged want of personal jurisdiction as an "affirmative defense." An affirmative defense is a new matter not set forth in the complaint which serves as a complete defense to it.[53] The party raising the affirmative defense generally bears the burden of proof as to that issue.[54] The Morrows argue that for this reason New Moon

---

that the design subcontractor knew that the ultimate destination of its work product was Alaska was a sufficient contact to render the subcontractor subject to Alaska's long arm jurisdiction. In *Jones Enterprises*, Judge Hufstedler relied heavily on *Duple Motor Bodies, Ltd. v. Hollingsworth*, 417 F. 2d 231 (9th Cir. 1969), in which the due process clause was held satisfied when the Hawaii long arm statute was used to obtain personal jurisdiction over an English manufacturer of a coach body that collapsed when a tour bus overturned. In *Duple*, commission of a tortious act in Hawaii coupled with the manufacturer's sale of the coach to Vauxhall, the chassis manufacturer, with knowledge that the coach was destined for Hawaii, met the requirements of due process.

50. 490 P.2d at 1199 (footnotes omitted).

51. *Lycoming Div. of Avco Corp. v. Superior Court*, 22 Ariz.App. 150, 524 P.2d 1323 (1974) ; *O'Hare Int'l Bank v. Hampton*, 437 F.2d 1173 (7th Cir. 1971) (Illinois law) ; *Midwest Packaging Corp. v. Oerlikon Plastics,* *Ltd.*, 279 F.Supp. 816 (S.D.Iowa 1968) ; *Tice v. Wilmington Chemical Corp.*, 259 Iowa 27, 141 N.W.2d 616 (1966) ; *Victory Carriers, Inc. v. Hawkins*, 44 Haw. 250, 352 P.2d 314 (1960).

52. *White v. Goldthwaite*, 204 Kan. 83, 460 P.2d 578 (1969) ; *Young Spring & Wire Corp. v. Smith*, 176 So.2d 903 (Fla.1965) ; *Detsch & Co. v. Calbar, Inc.*, 228 Cal.App. 2d 556, 39 Cal.Rptr. 626 (1964) ; *Proctor & Schwartz, Inc. v. Superior Court*, 99 Cal. App.2d 376, 221 P.2d 972 (1950). *See generally* C. Wright and A. Miller, Federal Practice and Procedure: Civil § 1351, at 561–62 (1969).

53. *Rollins v. Leibold*, 512 P.2d 937, 940–41 (Alaska 1973).

54. *Evans v. Buchner*, 386 P.2d 836 (Alaska 1963) ; *Ridgeway v. North Star Terminal & Stevedoring Co.*, 378 P.2d 647 (Alaska 1963) ; *Rees v. Archibald*, 6 Utah 2d 264, 311 P.2d 788 (1957) ; *Wilson v. California R. R. Co.*, 94 Cal. 166, 29 P. 861 (1892).

should bear the burden in this case of establishing lack of personal jurisdiction.

 Alaska Rule of Civil Procedure 8(c), modeled after the corresponding federal rule,[55] requires a defendant to "set forth affirmatively" its affirmative defenses. Failure to do so may constitute a waiver of those defenses.[56] Perhaps out of an excess of caution New Moon here reiterated its jurisdictional claim as an affirmative defense, which designation it now dismisses as a "semantic error." It is clear that absence of personal jurisdiction, properly viewed, is not an affirmative defense; such an allegation raises no new matter but simply denies the existence of one of the elements in plaintiff's case. What then is the effect of the erroneous designation of a specific denial of personal jurisdiction as an affirmative defense? We are of the opinion that it does not warrant shifting the burden of proof on the issue to the defendant. The purpose of the pleading requirements of Rules 8(c) and 12(b) is simply one of notice, to provide the plaintiff with a general summary of his opponent's defenses sufficient to fairly enable him to prepare for trial.[57] We are convinced that such notice was provided in this case, particularly in light of the fact that the defendant denied jurisdiction as well as raised the defense affirmatively. The appropriate course of action is simply to consider the matter as if raised by a denial and to disregard the label "affirmative defense." It would be unwise to penalize the defendant by shifting the burden of proof to him in this case, since the list of affirmative defenses in Rule 8(c) does not purport to be exhaus-

tive and a defendant should be encouraged to plead a defense affirmatively if he is in any doubt as to his ability to put the matter in issue under a denial.[58] Such a penalty would impede quick identification of the disputed issues and would be contrary to the liberal spirit of Alaska's rules of pleading.[59] We therefore hold that New Moon's erroneous designation of its challenge to personal jurisdiction as an "affirmative defense" did not alter the burden of proof in this issue, which in the first instance fell to the Morrows.

 The record demonstrates that in this particular case, however, New Moon did more than commit a "semantic error" in drafting its pleadings. The pre-trial memorandum of New Moon states that it intended to prove lack of personal jurisdiction. This evidently indicated to the Morrows that New Moon had assumed the burden of proof on the jurisdictional question, and New Moon said nothing to the contrary until closing arguments. We cannot know whether and to what extent the Morrows had prepared evidence to refute the purported proof of New Moon that it was not doing business in this jurisdiction, proof that was never forthcoming during the trial. The Morrows may well have chosen not to present jurisdictional evidence on their own initiative for fear of undermining their persistent (if mistaken) contention that the burden of proof was upon New Moon. Inasmuch as the superior court declined to rule on the burden question until after the close of the trial, the Morrows never had the opportunity to present jurisdictional evidence once their erroneous assumption was disabused. In

55. Fed.R.Civ.Pro. 8(c).

56. *Merrill v. Faltin*, 430 P.2d 913 (Alaska 1967); *Trio Process Corp. v. L. Goldstein's Sons, Inc.*, 461 F.2d 66 (3d Cir.), *cert. denied*, 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262 (1972); *Texas Gulf Sulphur Co. v. Robles*, 511 P.2d 963 (Wyo.1973). *See generally*, C. Wright & A. Miller, *supra* note 52, § 1278.

57. *Blonder-Tongue Labs, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 91 S. Ct. 1434, 28 L.Ed.2d 788 (1971); *Sly v.*

*United States*, 125 F.Supp. 89 (D.Ill.1954), *reversed on other grounds*, 220 F.2d 212 (7th Cir. 1955); *Mueller v. Rayon Consulants, Inc.*, 170 F.Supp. 555 (S.D.N.Y.1959); *cf. Schaible v. Fairbanks Medical & Surgical Clinic, Inc.*, 531 P.2d 1252 (Alaska 1975).

58. C. Wright and A. Miller, *supra* note 52, § 1278 at 352.

59. *Cf. Schaible v. Fairbanks Medical & Surgical Clinic, Inc.*, 531 P.2d 1252 (Alaska 1975).

these circumstances we think justice requires that the Morrows be given that opportunity. In light of the unusual procedural developments in this case, to affirm the superior court's dismissal for failure of jurisdiction would encourage deceptive strategems in the formative stages of litigation. Reliance on the opponent's pre-trial memorandum would be undermined, and the pre-trial procedures specified in Civil Rule 16 could even become a trap for the unwary. In the interests of fairness and judicial efficiency, this must be prevented. Consequently, we order that this cause be remanded for a new trial in which Morrows will have the opportunity to establish every element of their case, including personal jurisdiction over New Moon.

Reversed and remanded for a new trial in accordance with this opinion.

ERWIN, Justice (concurring).

While I concur with the opinion, I would extend the concept of strict liability to cover "economic loss" rather than use the warranty theory advanced by the majority.

The history of products liability law does not justify a distinction between personal injury and property damage. The primary purpose of the strict liability rule is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the consumers who are powerless to protect themselves.

Those in favor of the dichotomy between "economic loss" and other types of damage argue that an abolition of the distinction would result in manufacturers being liable for damages of unknown and unlimited scope.[1] This concept is embraced by the majority, which notes that the manufacturer who may now minimize liability by relying on certain provisions in the Uniform Commercial Code, would be unable to do so if the doctrine of strict liability were applied. In essence, this position intimates that manufacturers' rights under the Uniform Commercial Code should be maintained in order to assure the predictability of their potential liability.

I agree with Justice Peters of the California Supreme Court, who in his separate opinion in *Seely v. White Motor Co.*,[2] noted that the concerns expressed by the majority in this case would for all intents and purposes be eliminated if the notion of "defective" in the strict liability doctrine is viewed as co-extensive with the concept of "unmerchantability" in the implied warranty field. The term has been well defined by case law and has a fixed meaning so far as the Uniform Commercial Code is concerned.

If the doctrine of strict liability were adopted for cases such as the present one, the ordinary consumer, whose bargaining power is seldom equal to the manufacturers', would have the opportunity to bring an action against the original wrongdoer, instead of the local retailer who served as little more than a conduit for the defective product. The costs of such an action would properly be borne by the manufacturer. This procedure recognizes the average consumer's lack of sophistication with respect to the complex world of commerce and the Uniform Commercial Code.

---

1. In truth, practical limitations such as the cost of hiring an attorney would be a deterrent to most suits. Hence, only cases similar to the instant one where a substantial loss is involved would result in litigation.

2. 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145, 152–158 (1965).