GROPPEL COMPANY, INC., Appellant-Respondent (Plaintiff),

v.

UNITED STATES GYPSUM COMPANY, Appellant-Respondent (Defendant),

and

Underwriters' Laboratories, Inc., Respondent (Defendant).

Nos. 41452, 41453.

Missouri Court of Appeals, Eastern District, Division Two.

Jan. 27, 1981.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 24, 1981.

Application to Transfer Denied June 8, 1981.

Leritz & Reinert, P.C., Bernard A. Reinert, James F. Hespen, St. Louis, for Groppel Co., Inc., appellant-respondent (plaintiff).

Willson, Cunningham & McClellan, James S. McClellan, George C. Willson, III, St. Louis, for appellant-respondent, United States Gypsum Co.

Armstrong, Teasdale, Kramer & Vaughan, John J. Cole, St. Louis, for appellee (defendant), Underwriters' Laboratories, Inc.

GUNN, Judge.

Plaintiff, Groppel Company, Inc. (Groppel) filed a multiple count suit against defendants United States Gypsum Company (U.S Gypsum) and Underwriters' Laboratories, Inc. (sometimes U.L.) seeking damages arising out of the manufacture, sale and representation of an alleged defective product. Jury verdict was in favor of Groppel and against U.S. Gypsum for $268,711 actual and $806,133 punitive damages. The trial court granted summary judgment in favor of defendant Underwriters' Laboratories and on two counts of the amended petition in favor of U.S. Gypsum. Groppel has appealed from the adverse results of the summary judgment. U.S. Gypsum has appealed the adverse jury verdict. We affirm the award of actual damages with remittitur and reverse as to the punitive damages. We affirm the granting of the summary judgments, including the judgment in favor of Underwriters' Laboratories.

This litigation arose out of the construction of the Mercantile Center, a thirty-five story building in St. Louis. Groppel was the subcontractor responsible for applying fireproofing materials to the steel structure of the building. Its contract required it to spray-apply a fireproofing material to the steel structure for the purpose of minimizing and delaying heat conduction to the steel in the event of a fire. The fireproofing material was to be applied with a spe-

cific thickness that would provide a particular heat delay time rating as published in an Underwriters' Laboratories' bulletin entitled "Fire Resistance Index"—an authoritative source relied on by the construction industry concerning fire retardant ratings of materials. The application of the material was also to comport with the St. Louis City building Code.

One of the materials designated in the Fire Resistance Index was "SprayDon Standard J", a product of the Sprayon Research Corporation (Sprayon Research). SprayDon Standard J was an asbestos-free product formulated and developed by Sprayon Research and was manufactured by U.S. Gypsum according to the formula supplied by Sprayon Research. After extensive testing by Underwriters' Laboratories at the behest of Sprayon Research, the conclusion was reached that SprayDon J would be a suitable and approved fireproofing material yielding a proper fire protection rating provided that when it was applied it would maintain a minimum density of 11 pounds per cubic foot (pcf), although tests showed that SprayDon J tended to fail to fulfill the 11 pcf requirement. And, as later developed, this is where the rub came in.

As the SprayDon J was manufactured by U.S. Gypsum, personnel from Underwriters' Laboratories would make periodic inspections of quality control measures of the product. A favorable inspection permitted U.S. Gypsum to affix the Underwriters' Laboratories' seal to the package of material verifying that it had been classified by Underwriters' Laboratories as approved for use as fireproofing on certain design types. The label, however, did not refer to the density of the product. On the basis of the Underwriters' Laboratories Fire Resistance Index listing SprayDon J as manufactured by U.S. Gypsum as a suitable fireproofing material together with certain information in another construction industry catalog[1], Groppel determined that the product would be satisfactory for the Mercantile project. Circumspect of the financial well being of Sprayon Research Corporation as a supplier

of SprayDon J, Groppel received the assurance of U.S. Gypsum that it would continue with the supply of the product in the event of failure of Sprayon Research.

Groppel was awarded the fireproofing contract and issued its purchase order to Sprayon Research for 300 tons of SprayDon J at a cost of $52,850. Richard Kempthorne, president of Sprayon Research, outlined recommended procedures for an efficient fireproofing application, including advice that a testing laboratory periodically check the material for density and thickness of application.

In seeking approval of fireproofing plans from the general contractor, the architect and the City of St. Louis, Groppel advised the City's building commissioner that it would test the fireproofing for density and thickness after spraying each floor.

After being awarded the fireproofing contract Groppel employees applied the SprayDon J, consisting primarily of rock wool, Portland cement and adhering agents in a slurry mixture, by spraying it directly on the steel structure and under the initial supervision of Mr. Kempthorne. Thickness of the application was measured periodically by the simple technique of sticking a nail into the applied material. No density tests were undertaken until about 10 floors had been substantially sprayed, as other construction work was under way. When Groppel did engage a testing laboratory to spot check for density, test results showed a wide variance in density from floor to floor, with only two of the ten floors testing below the 11 pcf density requirement. But tests of a second testing laboratory employed and approved by the owner of the building revealed serious and wide spread density deficiencies in the fireproofing application. To a lesser extent thickness deficiencies also appeared—this after Groppel's work approached 92% of completion. Groppel met with the owner, architect, Sprayon Research Corporation and Underwriters' Laboratories—U.S. Gypsum was not present or represented—to discuss solutions

1. Sweet's catalog.

to the contretemps existing. The conclusion was reached that the lack of density could be overcome by having Groppel overspray the existing fireproofing to an extra thickness to compensate for a lack of product density. Groppel's workmen oversprayed the project and approval was given to the work. But the extra work was extremely costly—to the extent that after borrowing funds to complete the project, Groppel was forced to go out of business to pay for the loss.

Suit was then filed by Groppel against U.S. Gypsum and Underwriters' Laboratories to recover its loss and for punitive damages.[2]

The jury awarded Groppel actual damages of $268,711 for the cost of overspraying, including approximately $31,000 for lost profits and overhead expenses, approximately $44,000 in interest on funds borrowed to complete the work and about $34,000 from loss due to the forced sale of equipment and inventory.

*U.S. Gypsum's Appeal*

U.S. Gypsum alleges a multitude of trial court errors, many of them interrelated. It presents four separate reasons why the trial court should have granted its motions for directed verdict: (1) that Groppel did not present a submissible case upon the evidence, in that the evidence did not support the allegations that U.S. Gypsum knew or should have known that the fireproofing material did not meet the density requirements for the Mercantile project, that it could not be manufactured as formulated to meet such requirements, that it failed to warn of these facts; (2) that a submissible case was not presented under applicable law, in that the product alleged to have been unfit was not purchased from U.S. Gypsum, was not a dangerous product, and did not inflict physical harm on Groppel or its property; (3) Groppel was contributorily negligent as a matter of law because it did not make density tests as the work progressed; and (4) the punitive damages claim should not have been submitted to the jury because the evidence did not show "willful and intentional wrongdoing".

Also, U.S. Gypsum contends that the trial court should have granted summary judgment against Groppel for its failure to state a cause of action as urged in point (2) above. Furthermore, it asserts four separate reasons why its motion for new trial should have been granted: (1) the giving of a modified MAI 25.06 verdict directing instruction was improper; (2) an improper damages instruction, MAI 4.01, was given; (3) the verdict was excessive and remittitur should have been ordered; and (4) incompetent and irrelevant evidence was admitted over its objection.

We first consider U.S. Gypsum's argument that the summary judgment should have been granted against Groppel on Count III, the negligence cause of action.[3] The relevant portions of Count III allege that U.S. Gypsum "knew or should have known that the 'SprayDon Type J' material was required to be of a certain minimum density, i. e., 11 pounds per cubic foot, on being spray-applied to meet the project specifications" and that it "negligently furnished" the material "to plaintiff [Groppel] in that it failed to meet the specified minimum density of eleven (11) pounds per cubic foot on being spray-applied." Summary judgment is authorized only where the pleadings, depositions, admissions on file together with any affidavits reveal that there is no genuine issue of material fact and that a party is entitled to a judgment as a matter of law. Rule 74.04(c) Mo.R.Civ.P. The party moving for summary judgment must demonstrate by unassailable proof that there is no genuine issue of fact; a genuine issue of fact exists whenever there is the slightest doubt about the facts. *Cooper v. Yellow Freight System, Inc.,* 589

---

2. Groppel dismissed its action against Sprayon Research.

3. Counts I and II against U.S. Gypsum were dismissed upon motion for summary judgment.

Count I pleaded a breach of an implied warranty of fitness for particular purpose and Count II alleged a breach of contract.

S.W.2d 643, 645 (Mo.App.1979). *See Rockwell International, Inc. v. Westport Office Equipment*, 606 S.W.2d 477, 479 (Mo.App. 1980), for summary judgment standard of review.

We find that the information before the trial court was sufficient to raise at least a doubt whether U.S. Gypsum should have known that SprayDon J was required to be applied to a density of 11 pcf to meet project specifications. U.S. Gypsum had a general awareness of the use of Underwriters' Laboratories Fire Resistance Index standards in the construction industry, knew Underwriters' Laboratories tested the materials and had its labels on the product package, and that the material was to be applied on a high-rise office building. It also knew of prior complaints of SprayDon J's failure to meet the 11 pcf requirement on other projects.

When it considered U.S. Gypsum's motion for summary judgment, the trial court had before it an internal memorandum written in November 1972 by U.S. Gypsum employee John Ueber, a technical director in the Mineral Fiber Products Division, referring to numerous complaints about SprayDon J from job sites all across the country. The memo concluded: "My personal position is not changed. SprayDon is an improper formulated product and we must decide to withdraw from the market, force Sprayon Research to change formulation, or take over the product." At trial, Mr. Ueber, no longer employed by U.S. Gypsum, testified that he was aware in 1972 that the Underwriters' rating called for at least an 11 pcf density and that SprayDon J was not able to consistently meet this requirement. U.S.

Gypsum had received various complaints about lack of adhesion of the product to the steel surface, as well as failure to meet the 11 pcf minimum individual density.

Given that the pleadings raise some genuine issues of fact, and that these issues should be resolved in Groppel's favor, U.S. Gypsum maintains that Missouri law precludes an action on any theory of negligence presented by these facts. It argues that the settled law of this state is that, absent a contractual relationship between the maker of a product and its ultimate user, there can be no recovery against the maker by the user, except where the product is dangerous (either because of defect or because of dangerous characteristics, of which no warning is given) and inflicts physical harm upon the plaintiff or its property. The present case, so argues U.S. Gypsum, would not qualify, because (1) there is no contractual relationship between it and Groppel[4], (2) the product is not inherently dangerous, and (3) plaintiff's damage was merely "economic loss"[5], not physical damage.

Contrary to U.S. Gypsum's assertion, we do not find the law to be quite so "well-settled." Some of the precise questions raised have not been addressed by a Missouri court and other points have not received recent discussion. We consider this lack of recent case law important because of the enactment of the Uniform Commercial Code by Missouri in 1965 and the brisk evolution of the law in the products liability field. Fresh and comprehensive scrutiny of the legal principles involved in this area is warranted by this case and necessary for an orderly development of the law.

---

4. Count II specifically alleged the breach of a contractual agreement between Groppel and U.S. Gypsum. The evidence only supports a contract between Groppel and Sprayon Research for the sale of SprayDon J. Any contractual effect that the 'phone conversation between Groppel and U.S. Gypsum might have had was contingent in nature. Because that contingency ("something" happening to Sprayon Research) did not arise, we do not need to decide whether the 'phone call would have given rise to contractual rights.

5. "Economic loss" is distinguished from harm to person or damage to property: "Economic loss includes cost of repair and replacement of defective property which is the subject of the transaction, as well as commercial loss for inadequate value and consequent loss of profits or use." *Salmon Rivers Sportsman Camps, Inc. v. Cessna Aircraft Co.*, 97 Idaho 348, 544 P.2d 306, 309–10 (1975). *See, e. g.*, J. White & R. Summers, Uniform Commercial Code, 329–35 (1972); W. Prosser, Torts, § 101 (4th ed. 1971); Ribstein, *Guidelines for Deciding Product Economic Loss Cases*, 29 Mercer L.Rev. 493 (1978).

The first obstacle that U.S. Gypsum pitches in the path of the negligence action is lack of a contractual relationship between it and Groppel. The lack of privity defense has its roots in *Winterbottom v. Wright*, 10 M. & W. 109, 152 Eng.Rep. 402 (1842). Exceptions to the privity rule, however, have been with us for many years. *E. g., Orr v. Shell Oil Co.*, 352 Mo. 288, 177 S.W.2d 608 (1943) (recognizing a cause of action in negligence for failure to warn of inherent danger of certain chemical substances). And, indeed, the vitality of this arbitrary rule has been questioned more recently. *E. g., Westerhold v. Carroll*, 419 S.W.2d 73 (Mo. 1967). A more meaningful analysis, and inevitably an analysis involved in any negligence case, is to first determine whether the defendant owes any duty to the plaintiff. Lack of privity has been used as an arbitrary guideline to conclude that no duty is owed. While privity, or the lack of it, may be a relevant factor to consider when deciding if a duty is owed, we perceive no sound reason why it should be the determinative factor. Indeed, the courts of this state have often looked beyond the privity question to determine if the defendant owes a duty to the plaintiff, particularly when strict application of the privity rule "would produce a result contrary to the requirements of essential justice and sound public policy." *Id.* at 77.

The aforementioned reasoning is demonstrated by the adoption in *Keener v. Dayton Electric Manufacturing Co.*, 445 S.W.2d 362 (Mo.1969), of strict liability in tort for unreasonably dangerous products which cause physical damage, regardless of contractual privity. *Keener* followed the lead of the Restatement Second of Torts, § 402A, and held that sound public policy dictated the imposition of strict liability; that no negligence need be shown. *Keener* might be reasonably viewed as authority to preclude a strict liability action where the product was not unreasonably dangerous and physical damage to person or property did not occur.[6] It is not, however, authority for dismissal of the case *sub judice*, a negligence action.

A duty need not be grounded upon a face-to-face dealing between a plaintiff and defendant. For example, a duty may have its source in statutes and regulations, third party beneficiary principles, and other considerations of public policy as developed by case law. In the present case, the duty may be found in the statutes of the state. Specifically, the Uniform Commercial Code, § 400.2–314, RSMo 1978, imposes an implied warranty of merchantability upon the sale of goods:

(1) Unless excluded or modified (section 400.2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2) Goods to be merchantable must be at least such as

(a) pass without objection in the trade under the contract description; and

(b) in the case of fungible goods, are of fair average quality within the description; and

(c) are fit for the ordinary purposes for which such goods are used; and

---

**6.** A few jurisdictions, though, have allowed strict liability recovery for economic loss even where the product was not unreasonably dangerous. *E. g., Cova v. Harley Davidson Motor Co.*, 26 Mich.App. 602, 182 N.W.2d 800 (1970); *Santor v. A. & M. Karagheusian, Inc.*, 44 N.J. 52, 207 A.2d 305 (1965); *Air Products & Chemicals, Inc. v. Fairbanks Morse, Inc.*, 58 Wis.2d 193, 206 N.W.2d 414 (1973) (applying Pennsylvania law).

Most courts that considered the question, however, have refused to extend strict liability recovery to economic loss. *E. g., Jones & Laughlin Steel Corp. v. Johns Manville Sales Corp.*, 626 F.2d 280 (3d Cir. 1980) (applying Illinois law); *Morrow v. New Moon Homes, Inc.*, 548 P.2d 279 (Alaska 1976); *Beauchamp v. Wilson*, 21 Ariz.App. 14, 515 P.2d 41 (1973); *Seely v. White Motor Co.*, 63 Cal.2d 9, 45 Cal. Rptr. 17, 403 P.2d 145 (1965); *Hiigel v. General Motors Corp.*, 190 Colo. 57, 544 P.2d 983 (1976); *Hawkins Construction Co. v. Matthews Co.*, 190 Neb. 546, 209 N.W.2d 643 (1973); *Avenell v. Westinghouse Electric Corp.*, 41 Ohio App.2d 150, 324 N.E.2d 583 (1974); *Nobility Homes of Texas, Inc. v. Shivers*, 557 S.W.2d 77 (Tex.1977).

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

(3) Unless excluded or modified (section 400.2–316) other implied warranties may arise from course of dealing or usage of trade.

§ 400.2–314, RSMo 1978.

▆ The next question we must resolve is to whom this warranty duty extends— whether it only extends to the seller's immediate buyer or if it extends to other purchasers in the distributive chain also. In 1959, this court held that an implied warranty would not extend to one not in privity with the manufacturer where personal injury did not occur. *Smith v. Ford Motor Co.*, 327 S.W.2d 535 (Mo.App.1959). But we do not view that case as dispositive of the issues before us today. Section 400.-2–318 gives some guidance but does not completely answer this question:

A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty. A seller may not exclude or limit the operation of this section.

§ 400.2–318, RSMo 1978.

The Missouri Code Comment to this section notes that: "Missouri courts have required privity in warranty cases which involve goods other than food or drink. The food and drink decisions are distinguished on the basis of the nature of the product and do not depend upon a family or household relationship between the injured person and the purchaser...." This makes it apparent that the legislature was aware that § 2–318 changed prior Missouri case law by making an exception to the privity requirement for all goods, not only food and drink. Section 2–318, though, does not by its terms extend the warranties to the buyer's *vendee*, only to the buyer's family and household members and guests. The official Uniform Commercial Code Comment, however, adds this explanation:

This section expressly includes as beneficiaries within its provisions the family, household, and guests of the purchaser. *Beyond this, the section is neutral and is not intended to enlarge or restrict the developing case law on whether the seller's warranties, given to his buyer who resells, extend to other persons in the distributive chain.*

Note 3, Uniform Commercial Code Comment to § 2–318 (emphasis added).[7]

Courts of other jurisdictions that have a § 2–318 version identical to Missouri's have concluded that the statute speaks only about "horizontal privity" (who, besides the purchaser, has a right of action against the manufacturer or seller of a defective product), and is silent on the question of "vertical privity" (who, besides the immediate seller, is liable to the consumer for damages caused by the defective product). *Kassab v. Central Soya*, 432 Pa. 217, 246 A.2d 848, 855 (1968); *accord, Morrow v. New Moon Homes, Inc.*, 548 P.2d 279, 287 (Alaska 1976). The Pennsylvania Supreme Court has determined that: "Merely to *read* the language [of § 2–318] is to demonstrate that the code simply fails to treat this problem.... There thus is nothing to prevent this court from joining in the growing number of jurisdictions which, although bound by the code, have nevertheless abolished vertical privity in breach of warranty

---

7. The Official Comments to the UCC, while not having the force of statutory language enacted by the legislature, are a permissible and persuasive aid in determining legislative intent. *See, e. g., Interco, Inc. v. Randustrial Corp.*, 533 S.W.2d 257, 261, 262–63 (Mo.App.1976).

cases." *Kassab v. Central Soya*, 246 A.2d at 856.[8]

 There is a split of opinion in other jurisdictions about whether the implied warranty should be extended to remote purchasers, particularly when only economic loss is claimed, as in the present case.[9] We have reviewed the cases and are convinced that sound policy considerations support the extension of implied warranties to a remote purchaser and that economic loss should be compensable in this particular situation.

The rationale for the widespread demise of the privity requirement stems from the contemporary structure and operation of our free enterprise marketing and distribution system. Rarely does a consumer buy goods directly from the manufacturer—wholesale and retail middlemen are the general rule. The manufacturer realizes that only the ultimate consumer will use these products, and only the consumer will be harmed should they prove defective. Policy considerations parallel those given for the adoption of strict liability under Restatement § 402A: to insure that liability for damages caused by defective products is "borne by the manufacturers [and sellers] that put such products on the market rather than by the injured persons who are powerless to protect themselves." *Keener v. Dayton Electric Manufacturing Co.*, 445 S.W.2d at 364. Furthermore, there is the concern that requiring privity for implied warranty recovery would only "encourage manufacturers to use thinly capitalized 'collapsible corporations' to sell their commercially inferior products leaving no one for the buyer to sue for his economic loss." *Nobility Homes of Texas, Inc. v. Shivers*, 557 S.W.2d 77, 81–82 (Tex.1977).

U.S. Gypsum's argument against recovery that only economic loss was suffered is not convincing. While we agree that the courts have traditionally expressed greater concern for recovery for personal injury and property damage, economic loss often is a very grave consequence. Our analysis, however, by no means equates economic loss with bodily and property damage. We are not extending to economic loss the remedy of strict liability, under § 402A of the Restatement (Second) of Torts, which usually may be pursued when personal injury or property damage results from a defective product. The UCC affords the seller a number of defenses to liability for implied warranty under § 400.2–316(3)(b) and (c).[10]

---

**8.** According to J. White & R. Summers, Uniform Commercial Code, 330–33 (1972): "Either on strict tort or warranty theory, most courts have gone well beyond 2–318, and in a majority of states it stands like the Maginot Line, a carefully and conservatively constructed provision largely irrelevant to the battle ultimately fought." *See* Comment, *The Demise of Vertical Privity: Economic Loss Under the UCC*, 2 Hofstra L.Rev. 749 (1974).

**9.** Recent cases retaining privity requirement in implied warranty actions for economic loss include: *Koellmer v. Chrysler Motors Corp.*, 6 Conn.Sup. 478, 276 A.2d 807 (1970); *General Motors Corp. v. Halco Instruments, Inc.*, 124 Ga.App. 630, 185 S.E.2d 619 (1971); *Salmon Rivers Sportsmen Camps, Inc. v. Cessna Aircraft Co.*, 97 Idaho 348, 544 P.2d 306 (1975); *Necktas v. General Motors Corp.*, 357 Mass. 546, 259 N.E.2d 234 (1970); *Oliver v. City Builders, Inc.*, 303 So.2d 466 (Miss.1974); *Hupp Corp. v. Metered Washer Service*, 256 Or. 245, 472 P.2d 816 (1970); *City of Lacrosse v. Schubert, Schroeder & Associates, Inc.*, 72 Wis.2d 38, 240 N.W.2d 124 (1976).

Recent cases no longer demanding privity as a prerequisite to recovery of economic loss in implied warranty actions include: *Lynne Carol Fashions, Inc. v. Cranston Print Works Co., Inc.*, 453 F.2d 1177 (3d Cir. 1972) (stating Pennsylvania law); *Morrow v. New Moon Homes*, 548 P.2d 279 (Alaska 1976); *Manheim v. Ford Motor Co.*, 201 So.2d 440 (Fla.1967); *Hiles Co. v. Johnston Pump Co.*, 560 P.2d 154 (Nev. 1977); *Gasque v. Eagle Machine Co. Limited*, 270 S.C. 499, 243 S.E.2d 831 (1978); *Nobility Homes of Texas, Inc. v. Shivers*, 557 S.W.2d 77 (Tex.1977); *Western Equipment Co., Inc. v. Sheridan Iron Works, Inc.*, 605 P.2d 806 (Wyo. 1980).

**10.** § 400.2–316 Exclusion or modification of warranties

(1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this article on parol or extrinsic evidence (section 400.2–202) negation or limitation is inoperative to the extent that such construction is unreasonable.

(2) Subject to subsection (3), to exclude or modify the implied warranty of merchanta-

The obligation on the buyer imposed by (3) with regard to examination of the goods is roughly analagous to a contributory negligence defense, which was asserted by U.S. Gypsum, but would not be a sufficient defense if strict liability was to be imposed. Our decision simply recognizes that economic loss is potentially devastating to the buyer of an unmerchantable product and that it is unjust to preclude any recovery from the manufacturer for such loss because of a lack of privity, when the slightest physical injury can give rise to strict liability under the same circumstances.

U.S. Gypsum expresses concern that permitting recovery in negligence for economic loss will subject manufacturers to liability for damages of unknown and unlimited scope. This fear is unfounded. Because the negligence duty is derived from the UCC, the manufacturer is afforded an important protection against unforeseeable and unlimited liability by § 400.2–314(2)(c). This subsection states that goods are merchantable if "fit for the ordinary purposes for which such goods are used ...." Therefore, liability may be imposed only if the goods have been used for an ordinary purpose. Further, as in any negligence action, recovery is limited to those damages proximately caused by the defective product, and the buyer has the obligation to mitigate his damages.[11]

Inasmuch as we have determined that the UCC imposes a duty upon U.S. Gypsum to produce a merchantable product, the posture of this case requires a decision as to whether the remedy for a breach of that duty is limited to a statutory UCC recovery or if a common law negligence action may also be maintained. We recognize that the Code was drafted specifically to govern commercial losses and obviously sets forth the proper remedies to recover such losses. A negligence action, however, is not identical to the UCC claim. The implied warranty obligations of the Code apply without regard to any negligence, knowledge or fault of the vendor or manufacturer. *Smith v. Old Warson Development Co.*, 479 S.W.2d 795, 798 (Mo.banc 1972). Thus, to recover under the Code, a plaintiff need not allege or prove that the manufacturer was negligent in any way; he need only prove that the item was defective. The Code does require that the buyer give notice to his seller of the breach of warranty, § 400.2–607, RSMo 1978, whereas notice is not required when recovery is sought on a negligence theory. *Crowder v. Vandendeale*, 564 S.W.2d 879, 881–82 (Mo. banc 1978).

U.S. Gypsum contends that *Crowder* requires us to hold that a consumer, not in privity with the manufacturer, may not maintain a negligence action against the manufacturer for failure to supply a prod-

---

bility or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."
(3) Notwithstanding subsection (2)
(a) unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is", "with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; and
(b) when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no

implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him; and
(c) an implied warranty can also be excluded or modified by course of dealing or course of performance or usage of trade.
(4) Remedies for breach of warranty can be limited in accordance with the provisions of this article on liquidation or limitation of damages and on contractual modification of remedy (sections 400.2–718 and 400.2–719.

11. The U.C.C. imposes a similar limit to recovery in implied warranty cases. Section 400.2–715, RSMo 1978, only permits recovery for "commercially reasonable" incidental damages and consequential damages which are "proximately" caused by the breach of warranty, and requires the buyer to attempt to minimize his damages in good faith.

uct of merchantable quality. In *Crowder,* the second owner of a residential home, sued the contractor who built the house for negligence in its construction. The Court determined that any duty owed the homeowner would have to be grounded on the common law implied warranty of habitability. This warranty had been stated to be closely analogous to the implied warranty of merchantability found in § 400.2–314. *O'Dell v. Custom Builders Corp.,* 560 S.W.2d 862 (Mo.banc 1978). After considering the nature of recovery for deterioration of a house, the Court decided that any liability imposed upon a builder was contractual in nature and the implied warranty of habitability was the appropriate theory of recovery. The Court refused to extend an additional remedy in tort.

*Crowder* is distinguishable from the present situation for a number of reasons. The present case involves a sale of goods under the UCC; *Crowder* involved real estate which is not governed by the UCC. The "implied warranty of habitability" applicable to new homes, a creature of the common law, lacks the clarifying language of § 400.2–314. While *Crowder* was dealing with "deterioration", the present case involves a product which was alleged to be unfit for its intended purpose from the time it was manufactured. Furthermore, the dictum in *Crowder* regarding the appropriateness of a negligence action by a second purchaser against the builder of a "defective" house, *Crowder v. Vandendeale,* 564 S.W.2d at 883, is not entirely inconsistent with the type of recovery we allow in the present case.

*Crowder* was concerned with the problem of a builder who believes he has properly disclaimed or otherwise allocated the economic risks in the contract of sale with the first purchaser of the home and is later sued by a second purchaser. An important distinction to note is that the "first purchaser" of a home is generally someone who lives in and uses the property. Whereas, in the contemporary system of products distri-

bution, the "first purchaser" of the manufactured goods usually performs a distributing function only. He does not intend to put the goods to their intended use but merely holds them for resale to the next party in the distribution system, who may or may not be an ultimate user or consumer of the goods. The distribution system for new homes generally does not work that way; the developer or builder usually makes the first sale of the home to an ultimate consumer. Thus, we perceive the policy considerations to be much different.

U.S. Gypsum asserts the disclaimer defense that while it agreed to manufacture SprayDon J for Sprayon Research and warranted that it would be manufactured in accord with the formula, it specifically disclaimed all other warranties, including those "implied by operation of law". The UCC provides for the exclusion or modification of implied warranties in § 400.2–316, RSMo 1978.[12] This Code section is intended to ensure that the buyer is adequately apprised of the disclaimers and contemplates a contractual relationship between the two parties who are agreeing to limit the implied warranties. Section 400.2–318, however, which extends implied warranty protection for personal injuries to a class of persons not in privity with the seller, provides that the "seller may not exclude or limit the operation of this section." Therefore, the ability to disclaim granted in § 400.2–316 is explicitly limited by § 400.2–318. Furthermore, when an unreasonably dangerous product is marketed, the manufacturer's and seller's ability to disclaim liability is totally eliminated because of the strict liability in tort doctrine.

 The foregoing illustrates that disclaimer power is not absolute. And we hold that a manufacturer may not disclaim the implied warranty of merchantability to an ultimate consumer by merely including a disclaimer in a contract with a middleman or buyer who holds for resale only. To hold

**12.** *See* note 10 *supra.*

otherwise would permit unfair circumvention of the manufacturer's duty.[13]

Our holding does not restrict the right of a manufacturer and middleman to contract for indemnification. It merely provides the consumer the option of suing the manufacturer directly in circumstances such as presented in this case.

■ U.S. Gypsum also argues that it should be absolved of liability as it was merely following the Sprayon Research formula and did not breach its contract in that regard. But we reject this contention based on the views expressed.[14]

U.S. Gypsum further asserts that the evidence did not support Groppel's cause of action. We have previously dealt with that issue in reviewing the evidence of U.S. Gypsum's knowledge of the Underwriters' Laboratories Fire Resistance Index and its use in construction projects; the failure of SprayDon J to maintain the required 11 pcf density rating necessary in structures such as the Mercantile project; that Groppel would be applying SprayDon J on the project; that the product was sold with the U.L. label affixed; that the lack of density was product-related and would not meet required fireproofing standards.

■ Thus, while SprayDon J was not entirely useless as fireproofing material, it did not fulfil the consumer's reasonable expectations, and a practically worthless application resulted. We find that the evidence supported the proposition that SprayDon J was of unmerchantable quality; that it was "unfit for the ordinary purposes for which such goods are used." We recognize that the term "merchantable" is somewhat subjective and that some consumers may find SprayDon J entirely acceptable for their particular purposes. But it is clear that spraying the material on a high-rise structure to attain certain levels of fire protection is an "ordinary purpose", and Underwriters' Laboratories did not consider it fit for that purpose unless sprayed to a minimum density of 11 pcf. While Underwriters' Laboratories' standards are not ordinarily the only factors considered when deciding if a product is merchantable, they are highly persuasive here because of the nature of the product, the expense and complexity of testing a fire proofing material for fire resistance, and the industry's general reliance on its pronouncements. There was ample evidence to submit the case to the jury.

U.S. Gypsum's next point is that Groppel's evidence showed that it was contributorily negligent as a matter of law with regard to testing the material for density after application. In determining whether Groppel was contributorily negligent, its evidence must be considered as true and must be accorded the benefit of all reasonable inferences and the aid of defendant's evidence favorable to it. If reasonable persons would honestly differ upon whether Groppel exercised ordinary care in its density testing efforts the issue of contributory negligence was properly left to the jury. *Davenport v. Wabash Railroad Co.*, 435 S.W.2d 641, 646 (Mo.banc 1968); *Russell v. St. Louis County Cab Co., Inc.*, 493 S.W.2d 26, 29 (Mo.App.1973).

■ U.S. Gypsum argues that Groppel ignored the warnings contained in two letters from Sprayon Research concerning testing the material for thickness and density as it was applied and that it failed in its commitment to the City of St. Louis to have the material tested on each floor after application. Groppel maintains that it properly fulfilled its obligation for testing by hiring an outside testing company which failed to alert it to any general density problem;

---

13. A manufacturer still may properly disclaim liability *expressly* to the consumer via prominent package markings or otherwise in some manner calculated to give proper notice as contemplated by 2–316. We note also that the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*, may affect certain sales of goods.

14. *But see Sanner v. Ford Motor Co.*, 154 N.J. Super. 407, 381 A.2d 805 (1977), in which a manufacturer was allowed to escape liability for a safety defect in an auto built pursuant to military specifications based on an overriding national defense policy.

that it was prevented in some instances from making tests by other construction work; that testing on a partially completed floor would not have been reasonable under the circumstances. While in hindsight it may appear that plaintiff could easily have performed more tests, it does not appear that there was any reason for plaintiff to be particularly skeptical about the product's ability to achieve 11 pcf minimum individual density. We find that reasonable minds could differ about the question of plaintiff's contributory negligence and the issue was properly submitted to the jury, which resolved the matter in Groppel's favor.

■■■■ U.S. Gypsum's next point alleges that the trial court erred in submitting the issue of punitive damages to the jury, because as a matter of law the evidence did not support the charge. After being given MAI 10.02 the jury found punitive damages of $806,133 to be warranted. The instruction required the jury to find that U.S. Gypsum "showed complete indifference to or conscious disregard for the safety of others" by continuing to manufacture and sell SprayDon J. This is the appropriate instruction when a party is attempting to recover both actual and punitive damages in a negligence action. *Sharp v. Robberson*, 495 S.W.2d 394, 398 (Mo.banc 1973). Under MAI 10.02, malice does not have to be shown by the evidence. *Id.* While it need not be shown that the defendant intended to cause injury to anyone, the evidence must show that the defendant was aware that its acts were wrongful in some way.

In the present case, although we believe the evidence is sufficient to find U.S. Gypsum acted negligently, *i. e.,* it *should* have known that economic loss to a contractor might possibly result, we do not believe the evidence shows that it in fact knew that selling SprayDon J to Groppel amounted to a wrongful act. There is no evidence that shows U.S. Gypsum *knew* Groppel's work would be rejected if at least an 11 pcf density was not achieved. Accordingly, we must reverse the award of punitive damages.

■■ U.S. Gypsum next argues that plaintiff's verdict-directing instruction was improper. The instruction was derived from MAI 25.06, which is to be used when a dangerous product is marketed and the defendant is negligent because of failure to warn of the danger.[15] There is no MAI instruction tailored for use in an action for breach of implied warranty of merchantability.

U.S. Gypsum's complaints about the instruction parallel its arguments concerning the inability to bring this cause of action according to established case law. Inasmuch as we have determined that a cause of action may be brought on the present theory, we do not readdress those arguments. This is not a case involving a "deviation" from the applicable MAI form; there is no applicable MAI instruction. MAI 25.-06 was merely used as a starting point to provide the basic framework for the given instruction. The instruction as given covers all the elements required to be shown under

---

15. The instruction reads:

Your verdict must be for plaintiff Groppel Company if you believe:

First, United States Gypsum Company furnished SprayDon Standard J fireproofing material to Groppel Company, and

Second, the material failed to meet the required minimum density on being spray applied and was thereby unfit for use as spray applied fireproofing material, and

Third, the material was used in a manner reasonably anticipated, and

Fourth, Groppel Company did not know and by using ordinary care should not have known the material was unfit for use as spray applied fireproofing material, and

Fifth, defendant United States Gypsum Company knew or by using ordinary care could have known that the material was unfit for use as spray applied fireproofing material, and

Sixth, United States Gypsum Company failed to warn Groppel Company that the material was unfit for use as spray applied fireproofing material, and

Seventh, United States Gypsum Company was thereby negligent, and

Eighth, as a direct result of such negligence plaintiff Groppel Company sustained damage.

Unless you believe plaintiff is not entitled to recover by reason of Instruction Number 6. [Contributory negligence]

the theory of recovery herein approved. The instruction was "simple, brief, impartial, free from argument," and did "not submit to the jury or require findings of detailed evidentiary facts." Rule 70.02(e), Mo.R.Civ.P. It was not erroneous.

The next point advanced by U.S. Gypsum is that the use of MAI 4.01 as the damages instruction was error, as was found in *Sands v. McKelvey Building Co.*, 571 S.W.2d 726 (Mo.App.1978). It maintains that MAI 4.01 may be used only where personal injury or personal injury and property damage has occurred, and there was no personal injury to Groppel. In *Sands* the plaintiff sued the builder of his home for defective construction work, and MAI 4.01 was found improperly applied for plaintiff's property damages. MAI 4.02 and 4.03 were suggested as potentially acceptable instructions, depending on the evidence adduced upon retrial. *Id.* at 732. Additionally, in *Sands*, the court was not convinced that no prejudicial harm resulted from the use of MAI 4.01. *Id.* at 731; *accord, Ogle v. Terminal Railroad Association of St. Louis*, 534 S.W.2d 809 (Mo.App.1976); *State ex rel. State Highway Commission v. Beaty*, 505 S.W.2d 147 (Mo.App.1974). But the present case is distinguishable, and no prejudice resulted from the use of 4.01. This is not a typical property damage case contemplated by 4.02; it is more akin to a 4.03 type of situation in which misrepresented property has been sold. The Notes on Use to 4.03, however, provide that 4.03 may be used in a breach of warranty case "if plaintiff elects this measure of damages." But "[w]here plaintiff has evidence of other damages (such as personal injuries suffered because the property was not as warranted), MAI 4.01 should be used." Notes on Use to MAI 4.03. Fairly read, this explanation does not require that personal injuries be part of the "other damages" suffered in order to elect to use MAI 4.01. The UCC permits recovery for proximate consequential damages in breach of warranty cases, and there is no requirement that they be personal injuries only. Moreover, the damages here claimed were entirely foreseeable. We conclude that the use of MAI 4.01 was appropriate

and did not cause prejudicial harm to U.S. Gypsum. *Cf. Matulunas v. Baker*, 569 S.W.2d 791, 798 (Mo.App.1978) (no prejudice resulted from giving of MAI 4.01 in breach of implied warranty of habitability of new home case); *S. P. Personnel Associates of San Antonio, Inc. v. Hospital Building & Equipment Co.*, 525 S.W.2d 345, 350 (Mo. App.1975) (no prejudice resulting from use of MAI 4.01 although 4.05 also might have been applicable).

U.S. Gypsum's final point alleges error in admitting "incompetent and irrelevant" evidence at several junctures in the trial. First, objection was made to the admission of testimony about prior complaints concerning SprayDon J. The prior complaints were of its lack of density and lack of adhesion to the steel surface, which also occurred to some degree but apparently was not a major problem. The testimony indicated that the lack of density in prior jobs was most evident in areas that were not adhering properly and that the two problems were related. This evidence was offered for the purpose of demonstrating that U.S. Gypsum had knowledge of SprayDon J's density deficiency upon application. This testimony was properly admitted, as it related to applications similar to the Mercantile Center project. The evidence was probative for the issue of U.S. Gypsum's knowledge of a density problem with SprayDon J. The trial court did not abuse its discretion by admitting such evidence. *Cf. JKT Company, Inc. v. Hardwick*, 265 S.E.2d 510, 512 (S.C.1980) (held proper to admit evidence of prior complaints of defective roofing materials to show that manufacturer should have known that materials in question were defective).

U.S. Gypsum's next evidentiary complaint concerns the admission of testimony concerning interest paid on funds borrowed to finance the respraying work. It asserts that such interest paid cannot be recovered as part of the damages if "the basic damages are unliquidated in nature," citing *Protection Mutual Insurance Co. v. Kansas City*, 551 S.W.2d 909, 916 (Mo.App.

1977), and cases cited therein. Those cases are distinguishable from the present situation. Groppel did not recover "interest on his damages"; rather, it incurred a cost, an interest charge, on funds it borrowed to pay for the respray. In an analogous situation, recovery for the interest expenses has been allowed. *Herbert & Bronner Construction Co. v. Golden*, 499 S.W.2d 541 (Mo.App. 1973). The interest expense was an integral and proximate part of plaintiff's damages, as much as any of the other expenses of the respray allowed as damages, and no error appears.

■ The final evidentiary complaint concerns the introduction of evidence of the loss sustained by Groppel because of the forced sale of its inventory and equipment. U.S. Gypsum does not challenge the propriety of recovering such losses but asserts that there was no evidence of the fair market value of these items upon which to base computations of the losses. There was sufficient evidence of the market value of the inventory. Inventory lists were received into evidence, without objection, which contained the cost of each inventory item. The inventory was in original condition and had not been used. Cost appears to be a proper reflection of market value in these circumstances, and no evidence was introduced to the contrary. But the market value of the equipment and tools was not sufficiently established by the evidence. There was evidence of the purchase price and the depreciated book value of these items as reflected in plaintiff's income tax returns. But there was no testimony concerning the condition of the equipment and tools at the time of the sale. Thus, we find there was insufficient evidence in the record to properly establish loss on the sale of equipment and tools.

■ An award that is merely disproportionate to the proof of damages and which results from an honest mistake by the jury in assessment of the evidence may be redressed by an enforced remittitur and does not require a retrial. *Young v. Jack Boring's Inc.*, 540 S.W.2d 887, 897 (Mo.App. 1976). Because the jury apparently awarded $5,239 for this loss, we order a remittitur of that amount.

Our review of the evidence also leads us to conclude that other errors were made in the computation of plaintiff's damages that require remittitur. Groppel calculated its damages for loss on overspray by: (1) adding its total expenses for the entire job including overspray, and then (2) subtracting from that figure its projection of what it would have cost to complete the job without any overspray, and (3) adding on a 20% figure for profit and overhead. These calculations were presented to the jury in Exhibit 39 as set out below:

CALCULATIONS OF LOSS ON OVERSPRAY

$426,158.76 — Total amount spent on job.
Billing on 3/20/75 estimated to end of March 1975 —
92% complete which was approved by the architect and paid.
Total amount spent on the job to the end of March 30, 1975 was $247,064.17.
Cost to complete from 92% to 100% if no respraying was

required $= (\frac{100}{92}) (247,064.17) = $268,311.50$

Cost of respraying $= $426,158.76 − 268,311.50 = $157,846.87$
$157,846.87 + 20% profit + overhead = $31,568.37$ [sic]
Total cost of overspraying $= $189,415.14$

In Exhibit 52 plaintiff submitted to the jury its computation of total damages, including other consequential damages:

DAMAGES TO THE GROPPEL COMPANY, INC. DUE TO RESPRAYING THE MERCANTILE TOWER CENTER

| | | |
|---|---|---|
| 1. | Cost of respraying is | $189,415.14 |
| 2. | Interest paid and owed by the Groppel Co. | |
| | (a) Interest paid to the Manchester Bank | $ 16,869.58 |
| | (b) Interest owed on notes is | 27,153.28 |
| | Total interest | 44,022.86 |
| 3. | Loss due to forced sale of equipment and inventory is | $ 34,274.14 |
| | Lost profit on jobs under contract is | 21,093.60 |
| | | $ 55,367.74 |
| | TOTAL LOSS | $288,805.74 |

■ U.S. Gypsum's objections to testimony about the "Lost profit on jobs under contract" item were sustained. Thus, the jury heard no evidence upon which to base an award, and Groppel did not argue for damages on this item. Subtracting that amount from TOTAL LOSS yields $267,-712.14. The jury returned a verdict for $268,711 in actual damages. While no breakdown of individual items of damage was indicated, we conclude that the jury

awarded plaintiff the full amount of each item that had been testified to and argued for, including $189,415.14 for the "cost of respraying".

The calculation of the "cost of respraying", as reflected by Exhibit 39, contains serious flaws. First, it does not take into account the fact that Groppel would have had to perform a certain amount of overspraying in any event in order to correct thickness deficiencies. Just over 10% (19 out of 180) of the thickness tests made by Pittsburgh Testing Laboratory on floors three through seventeen revealed a thickness deficiency. Some deficiencies were miniscule, others relatively large, and we note that there was considerable improvement on the higher floors, with floors 10, 12, 13, 14 and 16 showing no thickness deficiencies in the twelve tests made on each floor. Also, numerous tests revealed a substantially excessive thickness of material and thus required minimal overspray in order to comply with Underwriters' Laboratories' formula for overspray. Taking these factors and the other evidence into consideration, we find that a just, though somewhat empirical result requires a remittitur of 5% of the cost of respraying: 5% of $157,846.87 = $7892.34; $157,846.87 − $7892.34 = $149,954.53.

The second fault with the loss on overspray calculation is that it adds on 20% for "profit and overhead". The testimony indicated that Groppel usually estimated a 10% figure for overhead and another 10% for profit when bidding on a project. Groppel's bid of $239,900 for the Mercantile project included 20% for profit and overhead. Overhead costs and lost profits are foreseeable items of damage in a case of this nature. While the 10% estimate of overhead costs for the overspray is not objectionable, the "lost profit" figure is in error. Exhibit 39 illustrates that 10% profit was figured on the overspray work. Groppel, however, is only entitled to the loss of "anticipated" profits, i. e., that profit it would

have made if the work had been completed without a density problem. *See Edwards v. City of Bowling Green,* 463 S.W.2d 604 (Mo. App.1971). Groppel did not anticipate having to perform the overspray and, logically, could not have anticipated any profit from it. In its bid of $239,900, it did anticipate a 10% profit. But its evidence indicates that with 92% of the work completed, the total approved contract amount was $242,632.90. The gross amount due to Groppel was $233,233, (from Exhibit 37), but the total amount spent on the project, not including overhead costs, was $247,064.17 (from Exhibit 39). These figures indicate that Groppel was actually going to lose money on the Mercantile job. While lost profits are recoverable if the evidence is certain enough to permit a rational estimate of such profits, *id.* at 605; *Venie v. South Central Enterprises, Inc.,* 401 S.W.2d 495, 503 (Mo.App.1966), the evidence here was insufficient to support any such award.

In accordance with the foregoing, Groppel's damages must be recomputed as follows:

Cost of respray ($149,954.53) + 10% overhead ($ 14,995.45) =
$164,949.98
Interest cost 41,821.72 [16]
Loss due to forced sale of inventory
($34,274.14 − 5,239 remittitur) 27,583.38
$234,355.08

### Groppel's Appeal

■■■ The remaining matter to be decided in this consolidated appeal is whether the trial court properly granted summary judgment in favor of Underwriters' Laboratories on Count IV of Groppel's amended petition. Groppel alleged that Underwriters' Laboratories, through its Fire Resistance Index, negligently misrepresented the properties of SprayDon J. It argues that the Index represents that SprayDon J will always achieve 11 pcf minimum individual density, or, at the least, that it is subject to differing interpretations which would pre-

16. "Interest cost" and "Loss due to forced sale of inventory" have been reduced by 5% also. Because the "Cost of respray" has been shown to be overstated, and because Groppel's evidence indicates a loss on the project was imminent in any event, we believe this reduction is appropriate and just.

clude summary judgment. Underwriters' Laboratories responds that there was no misrepresentation because it only indicated that the hourly fire rating would be if the 11 pcf density was achieved. We agree with UL's position in this regard.

There are two structural designs listed in the Index which are applicable to the Mercantile project—D849 and D852. Diagrams of the structures indicating the required thicknesses of the fireproofing are followed by explanatory text. The text following D849 includes:

Fiber, Sprayed—Applied by spraying with water in one coat after surfaces have been wetted with water, to a final untamped thickness as shown above, to steel surfaces which are free of dirt, oil or scale. Use of adhesive is optional. Min ind [sic] untamped density is 11 pcf. Tamping is optional. For method of density determination refer to the Design Information Section.

The text following D852 includes:

Fiber, Sprayed—Applied by spraying with water.... Use of adhesive is optional. Tamping is optional. Minimum tamped or untamped density of fiber shall be 11 pcf for "Standard A or J" fiber, or 7 pcf for "Standard G." For method of density determination refer to the Design Information Section.

We believe that the only reasonable interpretation of this information is that UL is representing that an 11 pcf density is a prerequisite to obtaining the desired hourly rating, i. e., if the material is sprayed on to the proper thickness with an 11 pcf density, the indicated level of fire protection will result. There is no evidence that this is not a true representation. The interpretation that Groppel urges—that the material will automatically achieve 11 pcf every time it is sprayed in a "workmanlike" manner—is unreasonable. Thus summary judgment for Underwriters' Laboratories was properly granted.

A number of considerations lead us to conclude that Groppel's interpretation is unreasonable. First, the fact that a required density is listed at all indicates that density is a variable that must be achieved; that it is not automatic for the particular material. Second, the reference to a "method of density determination" again leads to the conclusion that density is not automatic. Finally, the Index lacks information to sufficiently identify a "workmanlike" application. UL did not undertake to determine what procedures should be employed to achieve a "workmanlike" result and made no representations about them. And it appears that the combination of variables resulting in 11 pcf is an elusive one—so elusive that the jury determined the problem to be product-related and not a result of poor workmanship. It remains that it is unreasonable to construe Underwriters' Laboratories' Index as a guarantee that 11 pcf would result, and there is no misrepresentation of fact upon which to assert liability.

Groppel seems to suggest that UL had a duty to disclose that in two series of small scale density tests it found more than 11 pcf in only a third of the samples. While, looking back, it may appear that this data might have been accorded more significance by UL, we cannot say that it was bound to report it to the public. In any event, the information reported did not misrepresent any material fact. There is no evidence to indicate, and Groppel did not allege, any conscious effort to deceive as would constitute fraud.

Judgment as to actual damages for Groppel affirmed, with remittitur, for sum of $234,355.08. Reversed as to punitive damages. Judgment in favor of Underwriters' Laboratories affirmed.

PUDLOWSKI, P. J., and WEIER, J., concur.